**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone: (973) 623-3000
E-mail:  bgreenberg@litedepalma.com

**KNEUPPER & COVEY, PC**
Kevin Kneupper (*pro hac vice application forthcoming*)
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
Telephone:  (657) 845-3100
E-mail:  kevin@kneuppercovey.com
*Attorneys for Plaintiff Cindy Adam and the putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CINDY ADAM, individually and on behalf of all others similarly situated, | : Civil Action No.: |
| | : |
| | : **CLASS ACTION COMPLAINT FOR:** |
| | : |
| *Plaintiff*, | : (1) Violation of California's Consumer Legal : Remedies Act; |
| v. | : (2) Violation of California's False Advertising : Law; |
| SFLG INC. and KURT ELLIS, | : (3) Violation of the Unfair and Fraudulent Prongs : of California's Unfair Competition Law; |
| *Defendants*. | : (4) Violation of the Unlawful Prong : California's Unfair Competition Law; |
| | : (5) Violation of California's Automatic Renewal : Law; |
| | : (6) Violation of the Electronic Fund Transfer : Act; |
| | : (7) Civil RICO; |
| | : (8) Violation of Various Consumer Protection : Laws; |
| | : (9) Aiding and Abetting; |
| | : (10) Conspiracy. |
| | : **DEMAND FOR JURY TRIAL** |

1

842182.2

**LOCAL CIVIL RULE 10.1 STATEMENT**

1.     The mailing addresses of the parties to this action are:

CINDY ADAM, 221 Canterbury Ave., Daly City, CA 94015

SFLG INC., 41 Canal St., Lewiston, ME 04240

KURT ELLIS, 276 Greenwood Rd., Peru, ME 04290

## PRELIMINARY STATEMENT

2.     Plaintiff CINDY ADAM, individually and on behalf of all others similarly situated nationwide by and through the undersigned counsel, hereby file this Class Action Complaint against Defendants SFLG INC.; and KURT ELLIS, collectively "Defendants," and allege as follows:

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The believed scope of the damages and number of class members are based on Plaintiff's investigation and the BBB report attached as Exhibit 1, as well as the information filed in prior lawsuits against Defendants as discussed further below.

4.     This court also has jurisdiction because Plaintiff's Electronic Fund

Transfer Act claim, 15 U.S.C. § 1693e, arises under federal law.

5.     This court also has jurisdiction because Plaintiff's Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, 18 U.S.C. §§ 1961, *et seq.*, arises under federal law.

6.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over Defendants because Defendants have consented to jurisdiction in this action. Plaintiff originally brought this action against Defendants in the Northern District of California. In response Defendants requested that court transfer the case to this District and, as part of their argument, consented to jurisdiction in New Jersey for the claims recited here. Defendants are therefore estopped from arguing that are not subject to the jurisdiction of this Court.

8.     This Court further has personal jurisdiction over Defendants because they conduct and do business in New Jersey, including specifically a contract with the Barone/Chumenko Group (defined below), who reside in New Jersey and conduct their business operations out of New Jersey. On information and belief Defendants further marketed, promoted, distributed, and sold the products of the Barone/Chumenko Group in New Jersey, and Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this

842182.2

State through their promotion, sales, distribution, and marketing within this State in connection with the products at issue here, to render the exercise of specific jurisdiction by this Court permissible.

9.    This Court further has personal jurisdiction over all Defendants as to the RICO claim under 28 U.S.C. § 1965(b). Personal jurisdiction is appropriate as to the remaining claims under the doctrine of pendent personal jurisdiction because they arise from the same common nucleus of operative facts as the RICO claim.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## <u>NATURE OF THE ACTION</u>

11.    This suit involves a form of fraud and cybercrime that has become increasingly common across the Internet, known as the celebrity free trial scam. These scams entice consumers with fake celebrity endorsements, claiming that well-known celebrities have either endorsed or created a new line of cosmetics products. The operators of these scams offer consumers a "free trial"—just pay the shipping and handling, and you can try these amazing new products for free.

12.    But the products are anything but free. The scammers' only goal is to fraudulently obtain the victim's credit card or bank account information. And once they have it, they begin billing their victims for subscriptions they never signed up

for, never agreed to, and were never properly informed of. Using multiple websites, the scammers present one face to the consumer—a website offering the free trial with no disclosure of a subscription, or a disclosure buried in a terms of service on a separate page—and a totally different face to any banks investigating complaints, a second website which appears to fully comply with the law and fully disclose those subscriptions. But that second website, the "false front," is never actually viewed by the consumer. Instead, the consumer signs up for the fake "free trial" from a well-hidden landing page on a totally different website. Consumers are left with no recourse—the scammers have defrauded their banks into believing they consented to be billed, when in fact they did not.

13. These scammers operate in rings, as described in Exhibit 1. Those rings generally include: (1) affiliates, who are paid to advertise the fake celebrity endorsements, (2) creators of the product, who sell it and commit bank fraud by operating the "false front" websites, (3) fulfillment companies, who ship the product for a variety of scammers under the pretense of being a "nutra" manufacturer, and (4) "crooked processors" who assist the scammers in avoiding detection by bank and credit card companies.

14. These rings of scammers are structured in this way in the mistaken belief that the members of the ring will avoid liability by pretending to be legitimate businesses and pretending to have no knowledge of the actions of the

842182.2

others. But every member knows full well what they are doing—the fulfillment companies are often inundated with complaints, the creators of the product intentionally seek out affiliates to do their dirty work under the pretense of "independent contractor" agreements, and the "crooked processors" openly pitch themselves as being able to help their customers avoid fraud detection and chargebacks.

15.    Ms. Adam was a victim of these scammers—but many others have been as well. This lawsuit seeks to hold accountable the members of the conspiracy that defrauded her, defrauded her bank, and defrauded many other consumers as well.

16.    Many of the parties responsible for the scam are defendants in a related lawsuit that was originally filed in the Northern District of California and was transferred to this District pursuant to 28 U.S.C. § 1404(a). *Adam v. Barone et al.*, 3:20-cv-10321-MAS-LHG. Defendants were part of that original suit, but prior to transfer, the Court in the Northern District of California dismissed Defendants for lack of personal jurisdiction in California.

## **THE PARTIES**

### **Plaintiff**

17.    PLAINTIFF CINDY ADAM is a citizen of the state of California and resides at 221 Canterbury Ave., Daly City, CA, and resided there at the time of her

purchase of the Nuvega Lash products. On or around August 24, 2017, she signed up for a "free trial" of Nuvega Lash and was billed multiple times that day for their products. She was billed again without her permission on September 7, 2017 and September 8, 2017, resulting in an insufficient funds fee charged by her bank because of the unexpected billing. While she received a partial reversal of some of the charges from her bank, ultimately she was unable to recover all of the money taken from her as a result of her Nuvega Lash purchase.

## The Defendants

18.    SFLG INC., previously known as Great Lakes Fulfillment Services, is a Maine corporation located at 41 Canal St., Lewiston, ME 04240. On information and belief, SFLG Inc. is currently owned by GLF 2.0 LLC, a Delaware corporation.

19.    KURT ELLIS is a resident of Maine. Mr. Ellis founded Great Lakes Fulfillment Services in 2002, serving as President of the company until it was acquired in August 2019 by Jet Mail Services.[1] As of August 2019, Mr. Ellis had agreed to remain with the company as its President.[2]

---

[1] *Jet Mail Services to Compete in the E-Commerce Fulfillment Sector*, POST AND PARCEL, Aug. 20, 2019 at https://postandparcel.info/112643/news/e-commerce/jet-mail-services-to-compete-in-the-e-commerce-fulfilment-sector/ (last visited Dec. 11, 2019).

[2] *Id.*

842182.2

**Other Key Entities**

20.    As referenced in paragraph 16, other parties are defendants in a related suit already pending in this District. Those parties are:

    a.  FRANK V. BARONE, who is a resident of the state of New Jersey. He is listed as a member or manager of the Green Pogo LLC entity incorporated in New Jersey and as that entity's authorized representative. He also is a manager of Fortera Nutra Solutions LLC.

    b.  KIRILL CHUMENKO, who is a resident of the state of New Jersey. He is the Managing Member of Vegan Beauty LLC. Along with Mr. Barone, Mr. Chumenko operated various websites promoting Nuvega Lash and related products through a collection of shell companies.

    c.  GREEN POGO LLC (Delaware) is a Delaware corporation.

    d.  GREEN POGO LLC (New Jersey) is an identically named New Jersey corporation. It was formed on February 16, 2016 by Frank V. Barone. Hereinafter the two Green Pogo LLC entities are collectively referred to as "Green Pogo." Together, these entities sold Nuvega Lash and related products through their websites.

8

e. NATURAL BEAUTY LINE LLC is a Delaware corporation registered to do business in New Jersey. The websites shopnuvega.com, www.nuveganlashes.com, and www.nuveganbrows.com state at the bottom of the website that they are operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Mr. Chumenko's home address).

f. VEGAN BEAUTY LLC is a Delaware corporation. It has a branch office in New Jersey. Vegan Beauty LLC has previously been sued over a contract dispute involving its purchase of affiliate marketing services for the Nuvega Products. Kirill Chumenko is the Managing Member of Vegan Beauty LLC.

g. IMPROVED NUTRACEUTICALS LLC is a Delaware Corporation. It operates the website nuvegavegan.com, listing its business address as 9 Crest Fruit Ct, Manalapan NJ 07726 (Mr. Barone's home address).

h. FORTERA NUTRA SOLUTIONS LLC (previously Next Gen Health Solutions LLC) is a New York corporation with a New Jersey branch office located at 500 Campus Drive, Morganville,

9

NJ 07751.[3] On information and belief, Frank Barone is a manager of the company, as evidenced by his amendment of its Articles of Incorporation on the company's behalf.[4] The manufacturer of the Nuvega Products, Nutracosmetic GmbH, has repeatedly shipped imported cosmetics to another entity also located at this address, Advanced Beauty LLC.[5] Numerous consumers have complained on the BBB page for Next Gen Health Solutions LLC that they were fraudulently billed for subscriptions of Nuvega Products which they did not sign up for.[6] On information and belief, Fortera Nutra Solutions LLC used its merchant account or accounts to bill victims of the Nuvega Lash scheme.

---

[3] Red Fortera Trademark, Amendment and Mail Processing Stylesheet, http://tsdr.uspto.gov/documentviewer?caseId=sn87736922&docId=AMC20181122063236#docIndex=5&page=1 (last visited Jan. 8, 2020).

[4] Certificate of Amendment of the Articles of Incorporation of Next Gen Health Solutions LLC, http://tsdr.uspto.gov/caseviewer/assignments?caseId=87736922&docIndex=0&searchprefix=sn#docIndex=0 (last visited Jan. 9, 2020).

[5] Import Genius Summary for Advance Beauty, https://www.importgenius.com/importers/advance-beauty (last visited Jan. 8, 2020).

[6] Next Gen Health Solutions LLC Better Business Bureau Page, https://www.bbb.org/us/nj/morganville/profile/vitamins-and-supplements/next-gen-health-solutions-llc-0221-90181958/complaints#280204376 (last visited Jan. 8, 2020).

842182.2

i.  ADVANCED BEAUTY LLC is a Delaware corporation. It has a New Jersey branch incorporated on April 20, 2017. Advanced Beauty LLC is located at the same address as Fortera Nutra Solutions LLC, and it has accepted shipments of cosmetics from the manufacturer of the Nuvega Products which, on information and belief, included Nuvega Lash. Advanced Beauty LLC is the company behind a product called Advanced Lash, also sold by Mr. Barone and Mr. Chumenko.[7] The company's address is listed there as: 3 Welner Court, Manalapan NJ 07726. On information and belief, a merchant account attributable to this shell company was used to bill Plaintiff Adam and other members of the Class under the name "Advancedlash."

Collectively these entities and individuals that are defendants in the related suit will be referenced at the Barone/Chumenko Group.

## FACTUAL ALLEGATIONS

## Background on Free Trial Scams

21.    The Internet has been plagued in recent years by a flood of scams

---

[7] Advanced Lash Brow Formula,
http://www.advancedbrowformula.com/terms.html (last visited Jan. 29, 2020).

11

targeting consumers for "free trials" that are anything but free. Relying on fake news articles and fake celebrity endorsements, the scammers convince customers that they are signing up for a free trial of a product endorsed by a high-profile celebrity. But the customer soon discovers that they are being billed each and every month as part of a subscription they were never properly informed of and never agreed to. These scams are not just deceptive—they are criminal. This lawsuit seeks to shut down a ring of scammers who defrauded an unknown number of people, including the named plaintiff Cindy Adam.

22.    The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." Ex. 1. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the Federal Trade Commission, the report explains in detail the tactics used by scammers to exploit customers who are unaware of their fraudulent techniques.

23.    According to the report, these scams have "infested the internet and social media." Ex. 1 at 1. The report provides a detailed explanation of how the scams work—one that is virtually identical to the scam that was run by the Barone/Chumenko Group here with the assistance of Defendants.

24.    "You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these 'miracle' products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites. You may be enticed to try these products through a 'risk-free' trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited. Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund." Ex. 1 at 1.

25.     This is virtually a verbatim description of the illegal scam that was perpetrated here, as described further below. And as the Better Business Bureau recognized in its study, the sellers of these products are not the only active participants in these scams: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1 at 1.

26.     For example, the companies involved often hire "affiliates" to place advertisements for them or to create fake celebrity ads, paying them commissions. Ex. 1 at 3. Those affiliates are often hired or paid through a separate "affiliate network." *Id.*

27.     The Better Business Bureau describes the role of affiliates and affiliate networks as follows: "Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a 'landing page' that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these

misleading 'free trial' offers can be $30 to $50 for every person who signs up." Ex. 1 at 6.

28.     Another typical player in the scam operations is the "fulfillment company"—the company that manufactures and ships the products to consumers. The Better Business Bureau study makes clear that these fulfillment companies are active participants: "The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns." Ex. 1 at 9.

29.     A final type of participant in these scams are third party companies which assist in preventing the scammers from losing their merchant accounts with credit card companies or otherwise being flagged for their fraud: "Using a crooked processor. Banks that offer credit card processing hire Independent Sales Organizations (ISO's) to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity. But what if those providing processing services are in on the fraud? The FTC has sued a number of these ISOs over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the

credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11.

30.     The fact that "affiliate marketing" is rife with illegal scam operations is well known in the industry. At the Affiliate Summit West in 2019, the preeminent conference for affiliate marketers, the keynote speaker, Neil Patel, repeatedly acknowledged in frank language how widespread such scams are among Internet marketers and among attendees of the conference:[8]

> The sad reality is, at least for a lot of affiliates, the way affiliate marketing was a few years ago isn't gonna exist anymore and it's gonna get tougher and tougher. You know, I remember years ago in San Diego I was meeting some friends and they're like, yeah, we're selling some skin care product, we got to zero to $100 million dollars a year in revenue in twelve months with a brand new company. Those days are long gone. **As you can guess some of those guys probably got hit by the FTC as well.**

31.     Mr. Patel continued:

> I've got a marketing blog. I see what a lot of affiliate marketers think 'cause a shit load of 'em hit me up every single day, I think I'm number one on Google for affiliate marketing. I could be wrong, maybe number two. Either way I just get a ton of affiliate marketing traffic. So, let's go over fact number one: how affiliates currently make money. And hopefully you guys don't get offended, I'm just gonna be stating the facts. Churn and burn model with Facebook accounts. You guys know what I'm talking about, you used to pay people fifty bucks, it used to be crazy back in the day, people were paying hundreds of dollars for Facebook accounts and then they

---

[8] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).

842182.2

would churn and burn 'em. You guys familiar with this? No? I love it, you have the biggest smile and you're like, no, and now you're turning away, you're like don't look at me, hopefully no camera's on me. (LAUGHTER). That's okay. Everyone has to make a livin'. Hopefully you crushed it while you can. **The next model: fake news landing pages. "The Shocking Reason Why Joy Behar Is Quitting The View." Well it's because she took this new wrinkle cream.** (LAUGHTER). She looked ten years younger and now this is what she's selling. **And you know what? Joy's story is so amazing, on that landing page is also a testimonial from her friend Oprah.** (LAUGHTER). On how this wrinkle cream also made Oprah look twenty years younger. And you know what? Oprah also lost ten pounds while taking this wrinkle cream. (LAUGHTER). She was so addicted to it she was taking it at night, but luckily when her power went off she had one of those flashlights, the survival ones. (LAUGHTER). Right? **That's how affiliate marketers make money. And again, I've seen it, there's nothing wrong with it.** Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity. And that's fine as well. And again this is forced continuity, **you tell 'em it's a free trial, but they don't really see in the fine print that they're gonna get billed every single month. And then you target the older demographics who have no idea why they're continually getting rebilled. And then some of you guys have what's called a quote-unquote hell room that just deals with the calls. And the refunds. Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.**

32.    Mr. Patel acknowledged that a widespread FTC crackdown was

occurring:

The FTC has been cracking down on certain companies and industries, hence you're seeing a lot less forced continuity. You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't know what the saying is but it's more so they're controlling where the chargebacks are going.

33.     Mr. Patel described the FTC efforts to target not just affiliate marketers but companies such as Facebook:

> But they get pressure. 'Cause those old grandmas are like, hey! Facebook screwed me over! They sold me this wrinkle cream! One, I still have my wrinkles. Two, they keep advertising these false products. So they get pressure. The government doesn't just want to stop the companies, they go to the source and say, stop them from advertising.

34.     The attitude of Mr. Patel and others in the affiliate marketing "industry" that "there's nothing wrong with" this behavior is deeply disturbing: there is in fact something quite wrong with targeting the poor and the elderly with fake celebrity advertisements and fake free trials for the purpose of defrauding their credit cards for as long as possible until the victim finally notices. It is little more than outright theft conducted under the barest fig leaf of a "business"—and it is precisely what occurred here.

35.     These free trial scams generally involve more than one individual or companies conspiring together and generally playing the roles described above. Believing that they can pretend that their affiliates are independent contractors, or that they can pretend to see no evil and hear no evil and thus escape legal liability, the conspirators work together as a group to profit from the fraud. But they are quite wrong to believe that they are safe—every member of these conspiracies knows full well what they are doing, and every member is jointly and severally liable for the conduct of the others.

842182.2

## **Plaintiff Cindy Adam's Experience**

## **With Nuvega Lash**

36.    On or about August 24, 2017, Plaintiff Cindy Adam saw an advertisement for a cosmetics product called "Nuvega Lash" as she was browsing her SnapChat account. The advertisement claimed that Nuvega Lash was endorsed by Blac Chyna, a celebrity known for her appearances on multiple reality television shows, including Keeping Up With The Kardashians, as well as for various relationships with other celebrities such as Rob Kardashian and the rapper Tyga.[9] Ms. Chyna is further known for her brand of adhesive eyelashes called "Lashed by Blac Chyna," launched in 2013.[10] The advertisement Ms. Adam viewed featured a picture of Blac Chyna along with a claim that a "free sample" could be obtained for a small fee.

37.    The website viewed by Ms. Adam showed a number of five-star reviews of the Nuvega Lash products. It offered a free sample, stating that customers would only pay for the shipping and handling. It did not disclose the recurring monthly payments which the Barone/Chumenko Group intended to charge her. Unlike the initial advertisement, the website did not reference Blac Chyna. However, Ms. Adam believed that the website was legitimate because of

---

[9] *Blac Chyna*, https://en.wikipedia.org/wiki/Blac_Chyna (last visited Jan. 1, 2020).
[10] *Id.*

Blac Chyna's purported endorsement in the advertisement, and she relied on that purported endorsement in making her purchasing decision.

38.    Ms. Chyna continues to sell her own brand of eyelash products.[11] But on information and belief, she has never endorsed Nuvega Lash or the related products, there is no connection between her and the Nuvega Lash products, and the purported endorsement in the Nuvega Lash advertisement was a complete falsehood.

39.    Ms. Adam recalls purchasing two "free samples" from the site, as well as one product for roughly $15. She received three products: eyelash enhancer, eyebrow enhancer, and a lip plumper.

40.    On August 24, 2017, Ms. Adam's credit card was charged $4.99 with a charge described as: "08/23 Advancedlash8007848531 800-8748531 NJ." On the same day, it was also charged $4.95 with a charge described as: "08/22 Nuveganlashes 800-771-6369 NJ." And also on the same day, it was charged $14.99 with a charge described as: "08/22 Nuveganbrows 800-577-7806 NJ."

41.    On September 6, 2017, Ms. Adam's credit card was charged $94.97 with a charge described as: "09/06 Advancedlash8007848531 800-8748531 NJ." On September 8, 2017, this charge was reversed.

---

[11] Lashed Cosmetics, https://www.lashedcosmetics.com/ (last visited Jan. 2, 2020).

42.    On September 8, 2017, Ms. Adam's credit card was charged $92.94 with a charge described as: "Recurring Card Purchase 09/07 Nuveganlashes 800-771-6369 NJ." Because the charge was unexpected, Ms. Adam had insufficient funds and was charged a fee by her bank of $34.00 on the same day.

43.    On September 11, 2017, after complaining to her bank, Ms. Adam received a temporary reversal of $92.94 and another reversal of the $34.00 insufficient funds charge. Ms. Adam was only able to reverse the $34.00 insufficient funds charge because her bank permits her to remove one insufficient funds charge per year without cause. The fraudulent billing by the Barone/Chumenko Group damaged Ms. Adam because it forced her to exhaust that privilege for a charge she never should incurred.

44.    On October 30, 2017, Ms. Adam's bank, Chase Bank, undid the reversal of $92.94, reinstating the charge after an investigation. On information and belief, one or more of the individuals in the Barone/Chumenko Group made false statements to Chase Bank to the effect that she had agreed to the subscription and that it had been disclosed to her, and did so for the purpose of defrauding the bank and Ms. Adam.

45.    In total and after the partial reversals, Ms. Adam was billed $24.93 in initial shipping fees and $92.94 for a subscription which she was never informed of and did not consent to.

842182.2

46.     Ms. Adam was shipped three products. These included a lip plumper called Evolips by Evo Beauty and Nuvega Lash, both made by a company in Germany called Nutracosmetic GmbH.

47.     On information and belief, Defendants caused these products to be shipped to Ms. Adam.

48.     When Ms. Adam noticed the unexpected charges on her bank account, she called her bank to inquire as to what they were. Her bank told her they would give her a temporary credit while investigating.

49.     She contacted Nuvega Lash directly and spoke to an individual representing the company. That individual told her that she had agreed at the time of purchase to pay the full amount that she had been charged if she kept the "free samples." Ms. Adam did not recall agreeing to this, and never would have agreed to this. She told this to the representative of Nuvega Lash, who responded that he would let her speak to his manager but it would take a while. After several long waiting periods, the individual finally told Ms. Adam that a manager was unavailable. Ms. Adam believed that the representative of Nuvega Lash was intentionally stalling her to force her to hang up. The representative refused to issue an immediate refund, and instead demanded that Ms. Adam ship the products back before the company would consider issuing one. Ms. Adam understandably

did not trust the company which had just fraudulently charged her credit card without consent, and thus refused this offer.

50.    On information and belief, a call center operated by Defendants, acting on behalf of Nuvega Lash and the Barone/Chumenko Group, actually fielded Ms. Adam's call.

51.    Ms. Adam was right not to trust the Defendants and the Barone/Chumenko Group. They never would have refunded the money anyway— this was yet another stalling tactic the Defendants frequently used in the hopes that their victims would give up and go away. As another victim reported to the Better Business Bureau about their own experience: "Item was returned and company received on March 21, 2018 (proof of receipt on file). As of today, May 1, 2018, I have not received a refund to my credit card. Have contacted company 5 times since return to inquire on refund. On April 10, was told 7-14 days. On April 26, was told escalated to corporate for refund. On May 1, told 30 BUSINESS days for all refunds and to call back in 2 weeks to check status!"[12]

52.    Fortera Nutra Solutions LLC was involved in these contacts with Ms. Adam, and its employees had access to her account information, as evidenced by a February 24, 2020 e-mail between three employees of Fortera Nutra Solutions

---

[12] Green Pogo LLC BBB Page,
https://www.bbb.org/us/nj/manalapan/profile/online-retailer/green-pogo-llc-0221-90178228/complaints (last visited Jan. 4, 2020).

LLC who were able to access Ms. Adam's personal information from the company's records and circulated it among themselves using e-mail addresses from "forterans.com" (Vito Sforza, Kate Shakhlevich, and Tracy Meyer). The URL "trynuvegalashnow.com" which Ms. Adam interacted with was registered on November 3, 2016, which predates the existence of Natural Beauty Line LLC, formed on December 22, 2016. This domain was registered by Tracey Meyer, an employee of Fortera Nutra Solutions LLC. On information and belief, Fortera Nutra Solutions LLC owns and operates this website, on which Ms. Adam signed up for the free trial.

53.    All of the shell corporations within the Barone/Chumenko Group (Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC) contributed to and were a but-for cause of Ms. Adam's injury. By creating "false fronts" for Nuvega Lash, signing up for merchant accounts, and assisting in spreading the chargebacks among different accounts, they ensured that the fraud was not discovered by financial institutions. Each of these companies rotated their merchant accounts through Nuvega Lash victims using a CRM ("Customer Relationship Management") software called a "load balancer" designed to prevent any individual account from being flagged for fraud by managing and limiting the

24

chargebacks associated with each account. The source code for the trynuvegalashnow.com/v2/ landing page reflects that this CRM implementation consisted of a single software implementation used by all of the entities and individuals in the Barone/Chumenko Group, despite their nominal corporate separation. Whenever someone was billed for Nuvega Products, including all of the victims in California and New Jersey, one of the merchant accounts of one of the companies within the Barone/Chumenko Group would be selected by the software depending on the current level of chargebacks associated with each account. If an account accumulated too many chargebacks, it would be removed from the rotation. This conduct was expressly aimed at designed to defraud financial institutions. Had they not engaged in this merchant account scheme, the Barone/Chumenko Group would have been unable to bill Ms. Adam's credit card in September 2017 because all of their merchant accounts would have been flagged for fraud and canceled long before then.

54.    On information and belief, Natural Beauty Line LLC's merchant account was used for at least one of the billings to Ms. Adam.

55.    On information and belief, Advanced Beauty LLC is the seller of product described as "advancedlash" in the billings to Ms. Adam, and its merchant account was used to bill her.

56.    Frank Barone and Kirill Chumenko directed these corporations and

the activities described herein, created the Nuvega Lash scheme, and personally used their home addresses for at least some of these merchant accounts, including those used to bill Ms. Adam. On information and belief, they directed employees of Fortera Nutra Solutions LLC to implement this scheme without regard to corporate formalities among the various companies within the Barone/Chumenko Group, and those employees were involved in the sale to Ms. Adam.

57.    Ms. Adam was injured by the misrepresentations and unfair and unlawful business practices of the Barone/Chumenko Group. She suffered a loss of time, inconvenience, and a loss of money. She was deprived of her annual right to reverse an insufficient funds charge from her bank without cause. She further paid more for the products than she would have had she been aware that representations by the Barone/Chumenko Group were false, and ended up with products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Barone/Chumenko Group, and therefore suffered injury in fact.

## The Nuvega Lash Scam

58.    The "sales funnel" for Nuvega Lash—the series of websites which leads a victim through to signing up for a fraudulent free trial—is typical of the free trial scams that both the Federal Trade Commission and Better Business Bureau have issued repeated warnings to consumers about.

842182.2

59.     The victim initially encounters an advertisement for the product on a third-party site. In the case of Ms. Adam, she viewed an advertisement on SnapChat claiming that the celebrity Blac Chyna had endorsed the Nuvega Lash products. The advertisements tout Nuvega Lash, a cosmetics product which purportedly has achieved amazing results in helping women grow longer, fuller eyelashes.

60.     Many of these landing pages are hidden from search engines, are made inaccessible to anyone who does not view an advertisement, or are deleted after a few weeks or months to avoid detection. While the specific page or advertisement Mrs. Adam viewed is unknown, an exemplary affiliate advertisement for Nuvega Lash remains live on at least one website.[13]

61.     The Nuvega Lash affiliate page is titled "$4.95 All EyeLash Serum Gets Largest Deal in Shark Tank History."[14] The site is designed to mimic the format of a legitimate news article, with a logo at the top for "Entertainment Today – Insider News." A banner running across the top of the screen claims that Nuvega Lash has been featured in a variety of legitimate publications: The New York Times, Today, O Magazine, StyleWatch, and Redbook. A pop-up banner at the bottom urges victims to "Click to Get Your FREE Trial."

---

[13] *$4.95 All EyeLash Serum Gets Largest Deal in Shark Tank History*, http://healthyhair.healthfindings.website/lash.html (last visited Aug. 18, 2020).
[14] *Id.*



62.     The fake news article claims that the Shark Tank judging panel "unanimously decided to each invest over a million dollars" in Nuvega Lash, which was purportedly a company run by two sisters named Anna and Samantha Martin. In fact there are no such sisters: the women pictured are Shelly Hyde and Kara Haught of Raising Wild Swimwear, who appeared on Shark Tank in Season 8, but who have no affiliation with Nuvega Lash.[15]

63.     The article claims that the Shark Tank judges were amazed at Nuvega Lash, touting that it was "FDA Approved"—a complete falsity. It features a photo of six of the "sharks," Mark Cuban, Robert Herjavec, Barbara Corcoran, Lori Greiner, Daymond John, and Kevin O'Leary. The "sharks" are pictured toasting with champagne, presumably to their new investment in Nuvega Lash. The website

---

[15] *Raising Wild: What Happened To Bathing Suit Sisters After Shark Tank*, 2Paragraphs, https://2paragraphs.com/2017/10/raising-wild-bathing-suit-sisters-schooled-by-corcoran-after-shark-tank-as-founders-learn-to-prioritize-launch-sunglasses/.

goes on to claim endorsements from a number of other celebrities, not just the Shark Tank cast. For example, Oprah Winfrey is quoted as calling Nuvega Lash "groundbreaking" and helping women "grow lashes in a natural and healthy manner."[16]



*"NUVEGALash Revitalization is ground-breaking. They are the only company in the world who are effectively helping women grow healthy lashes in a natural and healthy manner." - Oprah Winfrey*

64.    Other celebrities are pictured as endorsers as well. Jessica Alba is quoted as having used Nuvega Lash herself to "amazing" effect, calling Nuvega Lash her "eyelash secret." Sandra Bullock is quoted as having obtained "stunning results" with Nuvega Lash. And Jennifer Aniston is quoted as using Nuvega Lash on the sets of her movies.[17]

---

[16] *$4.95 All EyeLash Serum Gets Largest Deal in Shark Tank History*, http://healthyhair.healthfindings.website/lash.html (last visited Aug. 18, 2020).
[17] *Id.*

65.    The landing page could not be clearer in representing to the victims that what they are signing up for is free, that Nuvega Lash is "giving away samples," and that "[t]he only cost you will incur is the discounted rate of $4.95:"

**GIVE YOURSELF THE STAR TREATMENT**

For a limited time anyone can try NUVEGALash Revitalization for free!

That's right, NUVEGALash Revitalization is giving away samples of their Instant Lash Conditioner to Americans for FREE.

The only cost you will incur is the discounted shipping rate of $4.95. The supplement will then be delivered straight to your door and ready to use immediately.

This offer won't last for long so make sure you follow the link below to claim your free sample today before they all run out!

66.    The affiliate landing page further repeatedly claims that there is a limited supply of Nuvega Lash remaining and urges victims to act quickly before it runs out. Victims are told that the Free Sample Promotion will end on a specific date—but that date itself is a misrepresentation. There is in fact no end date. The website code simply automatically inserts the current date as the purported end of the free trial.

............................ LIMITED TIME OFFER FOR OUR READERS ............................ ✂

(FREE SAMPLES RUN OUT DAILY - CLAIM YOURS NOW BEFORE THEY'RE ALL GONE)
IMPORTANT: During clinical testing it was proven that you MUST use this product DAILY to achieve similar results.

✓ Update: Only 2 Free Samples Still Available Today. Free Sample Promotion Ends: Wednesday, December 18, 2019

67.    Victims are again presented with a picture of Nuvega Lash and told that they will be signing up for a "Free Sample" and that they will "pay only $4.95 for shipping!"



68.    And finally, victims are presented with a serious of fake reviews at the bottom of the page purporting to come from real Facebook customers of Nuvega Lash.

69.    On information and belief, victims of Nuvega Lash who purchased from the Nuvega Lash website were all subjected to similar or identical representations, and were funneled from affiliate landing pages such as this one to a second landing page hidden on a Nuvega Lash website.

70.    The example affiliate landing page is old, and it is unclear which URL it linked to based on the available code. But on information and belief, that URL was http://trynuvegalashnow.com/v2/, a "landing page" on a website run by the Barone/Chumenko Group. The existence of this landing page is not immediately

apparent to anyone other than the victims. Anyone visiting the site by typing in the main domain name, trynuvegalashnow.com, would be unable to find it and would never even know it existed. But websites for affiliate networks attempting to entice affiliates to advertise for Nuvega Lash make clear that these affiliates were directing their victims to this specific landing page, and not to the main page of the Barone/Chumenko Group's website.[18]

71.    A partial image of the landing page taken from a desktop computer appears below:[19]



72.    At the bottom of this landing page when visited on a PC desktop—but **only** on a desktop—there is a lengthy disclaimer in tiny print.

---

[18] OfferVault Nuvega Lash Offer Page, https://www.offervault.com/affiliate-offers/details/offerId/14580394/nuvega-lash-now-trial-us-survey-allowed/ (last visited Dec. 14, 2019).
[19] http://trynuvegalashnow.com/v2/ (last visited Dec. 14, 2019).



73.     If a user visits on mobile or a tablet (the source of the great majority of Internet traffic), the website is programmed so that this disclaimer is not visible at all. Instead, as show in the screenshot of the website taken from an iPhone below, nothing appears below the "Rush My Trial" button and the victim cannot access or see the desktop disclaimer:



842182.2

74.    The disclaimer visible only to desktop users states in full:

Please read all packaging and labels carefully. Always consult your physician or healthcare provider before taking any supplement. If you have or suspect that you have a medical problem, please consult your physician or health care provider. The contents of this website are for informational purposes only. Not for use by children under the age of 18. These statements have not been evaluated by the Food and Drug Administration (FDA). Use only as directed. This product is not intended to diagnose, treat, cure, or prevent any disease or as a prescription for medication. Testimonial images are actor portrayals to protect the privacy of our customers providing testimonials. *If a hair follicle actually has died, it will not regrow hair. No products can make a hair follicle come back to life. The follicle however can still be alive but not growing hairs. We recommend using NUVEGALash over an 8 week period. Everyone is different while we hope our product works for everyone we cannot guarantee it will. You have no obligation to buy anything in the future as long as you call to cancel. In most cases shipping takes 4 days to receive your product. After placing your initial order, you will have 14 days to try the product & determine the benefits. 14 days after you place your order, your credit card will be automatically charged the full retail price of $94.97. You must call during the 14-day try it before you buy it period to not be billed the full retail amount. If you choose to cancel within your 14 day trial period, you will be provided an RMA number and you will need to return the items back to us. Please note that to ensure you receive a refund or to ensure a cancel order please provide us with a tracking number for the item you are returning. You may cancel at any time by calling Customer Service at 1-800-918-9094. Customer Care representatives are available 24 Hours Monday through Friday / 8am to 8pm Saturday & Sunday.

75.    Buried within the middle of this wall of tiny text is the disclosure that

customers must cancel within 14 days of their order or they will be billed $94.97

(and that in fact, they only have 10 days because shipping will take 4 days).

Nowhere does this desktop-only disclaimer state that the consumer is signing up for a monthly subscription.

76.     Once a victim enters their personal information, they are taken to a check-out page. An image of this check-out page for the desktop version of the trynuvegalashnow.com/v2/ landing page appears below.



77.     Notably, there is no requirement that users click a box or take any other action to agree to any terms of service. Instead, the link to the terms of service is located at the bottom of the screen next to several other links, in small text, and it requires users to scroll down to locate it. On the phone or tablet, the design for this page similarly requires no assent to the terms of service in any way, and again requires scrolling to a small link at the bottom to even view the terms.

78.     Users signing up for a trial of Nuvega Lash through this landing page are subjected to a number of false or misleading representations. Most gallingly,

victims are never told that they will be signed up for a monthly subscription for the product costing them $94.97 a month, plus $4.99 shipping and handling. In fact, they are told exactly the opposite: that they will "[j]ust pay a small shipping fee." And on the check-out page, victims are shown a graphic stating unambiguously that the price they will pay is $0.00, with $4.99 for Shipping & Handling.



79.    A few weeks later, victims who were told that they would pay $0.00 for the Nuvega Lash product are understandably shocked to see their credit card billed for nearly $100 they did not agree to. And if they do not immediately call to cancel, they find themselves being billed endlessly, each and every month. This is nothing more than credit card fraud—lying to customers about what they will pay, taking their credit card information, and billing them for something they never agreed to. But this is just the beginning of the misrepresentations.

80.    Victims are also repeatedly told that the supply of Nuvega Lash is limited. On the first page, they are told: "Due to high demand, supplies are limited. Get your order today!" When a victim proceeds to the shopping cart, they are presented with a graphic with a red bar supposedly describing the Current

Availability as "LOW STOCK" and urging them to "Act Now!" and to "Act now so you don't miss out on this offer!"

**Great Job!** You're one step closer to beautiful brows.
Act now so you don't miss out on this offer!

Current Availability: ▮▮▮▮  **LOW STOCK.** Act Now!

Just pay a small shipping fee. Enjoy expedited delivery!
Your order is scheduled to arrive by **Sunday,
December 15, 2019**

81.   A prominent arrow below this claims there are "LIMITED QUANTITIES AVAILABLE."



82.   In fact, the graphic purporting to be a representation of "current availability" is simply a static image that does not reflect the current supply of Nuvega Lash at all. And these representations have been constant for years on end—when there is no shortage of Nuvega Lash, and on information and belief, there never has been.

83.   The landing page claims that using Nuvega Lash will permanently lengthen and strengthen a user's eyelashes: "NUVEGALash is an innovative, nature packed serum, made from a combination of natural herbs and oils to give

842182.2

your eyelashes a new rejuvenated look. Soften lashes in the evening with our NUVEGALash and wake up in the morning to feel the effects. The good news? The change is not temporary! NUVEGALash moisturises the eye follicles, helping promote longer and stronger lashes."

84.    If a user types in the URL trynuvegalashnow.com, they see an entirely different website—but one that is little better. A partial image of this website appears below:



85.    On information and belief, victims of this scam were directed to the /v2/ landing page, rather than the main page. But any victim who purchased from the main page would have been subjected to similar false representations to induce them to purchase.

86.    For example, at the top of the page, users are told that there is a limited supply of Nuvega Lash, and that "[d]ue to high demand from recent media

38

coverage we can no longer guarantee supply." But this is false—there does not appear to have **ever** been any media coverage of Nuvega Lash. Instead, this false representation is designed to dovetail with the fake celebrity advertisements/articles which a victim would view before arriving at the website.

**ATTENTION:** Due to high demand from recent media coverage we can no longer guarantee supply. As of **January 9, 2020** we currently have the product IN STOCK and will ship within 24 hours of purchase.

87.    Visitors to the main page are also told that Nuvega 1 will give them "[e]yelashes from 30 to 50% longer, thicker, and darker in 6 – 8 weeks." The main page also claims that Nuvega Lash alters the functionality of the human eyelash as well as its hair cells: "NUVEGALash not only extends the growth cycle of lashes, but also nourishes and stimulates the hair cells."

88.    As of January 2020, the shopping cart on the main page is broken. But on information and belief, the following checkout page is at least one prior version of the desktop shopping cart for the main page of trynuvegalashnow.com:[20]

---

[20] Checkout Page, https://trynuvegalashnow.com/discount.php (last visited Jan. 9, 2020).



89.     This checkout page contains a lengthy "disclosure" paragraph in tiny text with the font color set to a light grey that is almost unreadable against the white background:



90.   And again, the "disclosure" is coupled with express claims that the victim will pay "$0.00" for Nuvega Lash and will only pay a $4.99 shipping fee:



91.   On mobile, the shopping cart still appears to be active, and users visiting the main page of trynuvegalashnow.com are shown a small text disclosure of the subscription program paired next to a larger, bold-text claim that the user will pay "$0.00" for Nuvega Lash and $4.99 for Shipping:



92.    Because the desktop shopping cart is currently broken, is unclear whether the differences in the mobile and desktop disclosures of the main page of trynuvegalashnow.com represent the page as it always was, or whether there have been changes over time which these differences reflect. On information and belief, for at least some periods of time, the main page of trynuvegalashnow.com was being used to fraudulently convince bank employees that victims had purchased from that page, as opposed to the landing page to which affiliates and advertisers actually directed their traffic, trynuvegalashnow.com/v2/.

842182.2

93.     Just as an old-time speakeasy would maintain a false front of a legitimate business operation to distract law enforcement from their criminal activities, the Barone/Chumenko Group also operate multiple other websites whose sole purpose appears to be to trick anyone conducting an investigation into the validity of these purchases (such as a bank or credit card company deciding whether to grant a chargeback to a consumer who complains).

94.     These "false front" websites are designed to appear legitimate. Unlike the website consumers actually see when they sign up for the free trial, trynuvegalashnow.com/v2/, these sites contain a prominent terms of service, requiring that a box be checked to purchase the product. And unlike the website shown to consumers, the "false fronts" explicitly disclose that a consumer using those websites would be signing up for an ongoing subscription. In all respects, they are designed to look like a legitimate company and not a scam.

95.     The maintenance of these false front websites is itself an act of deception, intended not just to hide from law enforcement but to prevent consumers from exercising their lawful right to a chargeback by their bank or credit card company for charges they never agreed to. Presented only with the false front, banks and credit card companies cannot know that there is fraud being conducted behind it.

96.    The Federal Trade Commission has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[21]

97.    This is exactly what the Barone/Chumenko Group have done here. Barone and Chumenko operate a host of shell companies, all of which run websites promoting Nuvega Lash or its related products such as Nuvega Brow. Each presents itself to visitors as if it is the official website of the Nuvega Lash products, and each lists a different company as the one that is selling Nuvega Lash. On its surface this would appear to make no sense: there is no business reason to sell the

---

[21] Leslie Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal Trade Commission Business Blog (2017), https://www.ftc.gov/news-events/blogs/business-blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements (last visited Sept. 6, 2019).

same products from so many different shell companies, with so many different near-identical websites. But that is not the purpose. The purpose of these websites is to make it more difficult for banks to identify the Nuvega Lash operation as a fraud by separating out and controlling which merchant accounts and which shell companies the chargebacks are attributed to, and thus preventing or delaying any one merchant account from being identified as conducting a fraud.

98.    One    group    of    these    "false    front"    websites    consists    of www.nuveganlashes.com;    www.lashesbynuvega.com,    www.nuvegavegan.com; www.nuveganbrows.com;    and    www.shopnuvega.com.    Each    of    these    websites looks almost identical with very minor variations, except that they list a different corporate entity as the owner, listing different phone contact information, and different addresses as the location of Nuvega Lash (or in one instance Nuvega Brow). The "above the fold" section of these sites (the portion immediately viewed by    the    user    before    scrolling)    appears    as    follows,    taken    from www.lashesbynuvega.com:



99.    Unlike the actual site which victims view, trynuvegalashnow.com/v2/, these "false front" websites make a disclosure of the trial terms above the order button and require the user to click to agree to the terms of service.

100.   The website www.nuveganlashes.com states at the bottom of the website that it is operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Mr. Chumenko's home address). The website was registered by Tracey Meyer, an employee of Fortera Nutra Solutions LLC, on March 11, 2017.

101.   The website www.lashesbynuvega.com states at the bottom of the website that it is operated by Green Pogo LLC at 9 Crest Fruit Ct, Manalapan NJ 07726 (Mr. Barone's home address).

102.    The website www.nuvegavegan.com states at the bottom of the website that it is operated by Improved Nutraceuticals LLC at 9 Crest Fruit Ct, Manalapan NJ 07726 (Mr. Barone's home address).

103.    The website www.nuveganbrows.com states at the bottom of the website that it is operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Mr. Chumenko's home address). The website was registered by Tracey Meyer, an employee of Fortera Nutra Solutions LLC, on March 10, 2017.

104.    The website www.shopnuvega.com states at the bottom of the website that it is operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Mr. Chumenko's home address).

105.    Three other websites use an identical layout to the sites above, but list addresses that on information and belief are of friends or business associates of Barone or Chumenko.

106.    One of these three other websites, www.browbynuvega.com, states at the bottom of the website that it is operated by Nu Beauty Care LLC at 270 Arthur ave (sic), Englewood Cliffs NJ 07632. Nu Beauty Care LLC is the New Jersey branch office of an unknown corporate entity.

107.    Another site, www.bestveganlash.com, states at the bottom of the website that it is operated by Tykhe Enterprise LLC at 21142 NE 31ST Pl,

Aventura, FL 33180. According to WhoIs data scraped from the ICANN registry, this website was registered historically to someone from the state of New Jersey.[22]

108.   Another site, www.bestveganbrow.com, states at the bottom of the website that it is operated by Tykhe Enterprise LLC at 21142 NE 31ST Pl, Aventura, FL 33180. According to WhoIs data scraped from the ICANN registry, this website was registered historically to someone from the state of New Jersey.[23]

109.   Tykhe Enterprise LLC is the name of a Delaware corporation with no current registered agent. A Florida corporation is named Tykhe Enterpris**es** LLC, (emphasis added), but it is unclear from publicly available documents how or whether these entities are related to the Barone/Chumenko Group.

110.   A third "false front" website design utilized by the Barone/Chumenko Group appears on www.nuvegalashforvegans.com, which applies a slightly different layout from the aforementioned "false front" websites, but again is designed to appear as if it is a legitimate website which discloses its trial terms to consumers. This website states at the bottom of the website that it is operated by Green Pogo LLC at 9 Crest Fruit Ct, Manalapan NJ 07726 (Mr. Barone's home address). A partial image of its front page appears below:

---

[22] Whoxy Search, https://www.whoxy.com/bestveganlash.com (last visited Jan. 7, 2020).
[23] Whoxy Search, https://www.whoxy.com/bestveganbrow.com (last visited Jan. 7, 2020).



111.   If a visitor to www.nuvegalashforvegans.com clicks on the "Get My Free Trial!" button, they are taken to a checkout page hosted on nuveganbrows.com which makes a prominent disclosure of the terms at the top of the page, and requires the user to click a prominent box at the bottom to agree to the terms of service. To an unsuspecting bank employee reviewing this page, it would appear that Nuvega Lash victims had in fact consented to be charged—if only this were the website the victims had actually visited:



112.   On information and belief, the Barone/Chumenko Group present these "false front" websites to customer's banks whenever a chargeback is being investigated, fraudulently representing to the bank that it was the website the customer used to sign up for Nuvega Lash. As the BBB report stated: "in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11. And here, the Barone/Chumenko Group have spread their charges over multiple shell corporations (and presumably multiple merchant accounts) to avoid accumulating too many chargebacks on any one account and being flagged for the fraud they are conducting.

113.   One angry victim of the Nuvega Lash scam recognized this pattern in their bank statement and complained of it online, believing the tactic was designed to confuse consumers:[24]

---

[24] Report Scam, https://reportscam.com/trynuvegalashnowcom (last visited Jan. 5, 2020) (emphasis added).

Ordered their $14.99 product after seeing their ad on the internet. They started charging $99 from next month for a product I never authorized them to sent me on monthly basis.

Their customer service is very shady, they initially kept telling me to take a discount and keep the product but in the end said that by their policy they can only return 25% and I have agreed to but their products.

The confirmation email of $14.99 order I made has no mention of $99 monthly charge. **They keep changing the merchant name while making transaction so that you don't recognize them (VBEAUTY, ADVANCEDLASH, GRNPOGO)**

Called my bank to get the transactions disputed and further transactions blocked. Stay away from this CON company.

114.    Ms. Adam experienced the same pattern: she was billed from three separate merchant accounts for her shipping charges, and her subscription was billed from two different merchant accounts. But this is not a ploy to confuse consumers, but to defraud their banks. Instead what the Barone/Chumenko Group did here was just what Neil Patel described in his keynote speech to a roomful of such scammers: "Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.... You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't

know what the saying is but it's more so they're controlling where the chargebacks are going."[25]

115.   Other victims explained in detail their experiences in online reviews or fraud reports, which were similar or identical to that of Ms. Adam.

116.   For example, the Amazon page for Nuvega Lash, sold there by Green Pogo LLC, is flooded with reviews from victims of the scam who say that they were billed without their consent—and that Nuvega Lash made it almost impossible for them to cancel the subscriptions they never agreed to in the first place. Many of these victim report that they purchased the product directly from the Nuvega Lash website.

117.   A victim posted on Amazon on January 5, 2019: "I signed up for their trial...nothing on the site said anything about additional charges. They've now charged me two months in a row and no product. HOW DO YOU GET IN CONTACT WITH THEM? Thanks."[26]

---

[25] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).
[26] Nuvega Lash Amazon Page, https://www.amazon.com/ask/questions/Tx10HCB3TU4N2PB/ref=ask_dp_dpmw _al_hza (last visited Dec. 16, 2019).

118.   A victim posted on October 20, 2018: "Yes, I bought the 'free trial'. Never received the product, was then charged $94, with NO refunds. A complete scam, AND the money back guarantee is a lie."[27]

119.   Another victim posted on October 17, 2017 a review titled "Serum Isn't Worth Their Dirty Tactics." She stated:[28]

> I purchased the Nuvega lash and brow serum through an ad I saw (not Amazon) and it said nothing about the fact that I was signing up for a 14-day trial and that after the 14 days I would be charged $94 for one tube and $92 for the second tube. Once I saw the charges on my credit card I called to have them reversed. They said I had agreed to the terms of the trial, but no where when I ordered the product did it say anything about the trial or the subsequent charges. The person on the phone was rather incredulous and somewhat rude. They have a 30-day money back guarantee, but you are of course out the shipping to return it. They said the two tubes were a two month supply for lashes and brows, but the vials are so small I seriously doubt it would last that long."

120.   Multiple other victims of the Nuvega Lash scam responded to this review saying the same thing had happened to them. One said: "I had a similar experience, although I ordered directly from them -- no where did it say anything about a subscription, nor did the live person I spoke with say anything. Had a very difficult time stopping charges; it took a while, they would not even do anything

---

[27] Nuvega Lash Amazon Page, https://www.amazon.com/ask/questions/Tx2SBA3B8LW7J1K/ref=ask_dp_dpmw_al_hza (last visited Dec. 16, 2019).
[28] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/RF36BYAN9POZG/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06XN KS7L6 (last visited Dec. 16, 2019).

before some time had passed, and of course the expected me to return the product, at my own expense...and that I had used some of it was apparently a huge problem. The people on the phone -- I spoke with several, over several calls -- were uniformly rude and *extremely* evasive. The product seemed to work but never, ever will I do any business with the company again. Absolutely NOT TRUSTWORTHY."[29]

121.    Another victim replied to this review saying "They did the same thing to me. Luckily my credit card company declined the charge, TWICE. Do not order this product. I am putting a report on the BBB also."[30]

122.    Another replied: "thank God your bank notified you. I also signed up for a free trial and agreed to pay shipping and next thing i know they took $200.00 from me. i am going to call amazon and ask them to not let them even be on there. I am so angry at thieves. People don't need to rob your houses any more its too easy to scam you on line. Lesson learned do not go for free trials anymore on line and don't give out your card info for free trials. It pisses me off because i am usually so careful. Also the customer service numbers to talk to them are bogus,

---

[29] *Id.*
[30] *Id.*

when you dial doesn't even ring, call immediately drops. SCAM SCAM SCAM CAN YOU SAY BIG SCAM."[31]

123.   Still another victim replied: "I have been duped by this company no replies to emails or messages. Does not answer phone any suggestions for help."[32]

124.   Another victim reported that she had to stop payment through her bank: "I fell for the same scam , said get this product free all you have to do is pay shipping , then a few weeks later my bank called saying there trying to take 95 out of my account I told them to stop payment , now I get a email saying they will knock off 50 percent if I still want product .. there words for sellers l8kw this ... I also fell for trap there's nothing there bout trying product for 14 days it says free I will not fall for this kind of top again and No never buy from them there very dishonest."[33]

125.   One victim reported in an Amazon review that the company was claiming that Dr. Oz had endorsed Nuvega Lash: "This is a scam to get your credit information. In less than 8 days after ordering a free sample you will be charged $94.97 and $89.97. Not enough time is given for the product to arrive and see any results. Avoid this scam at all costs. It is unlikely that Dr. Oz is aware of this product being advertised using his name, as stated in the ad. This is not a free trial.

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

A free trial would send you a trial size sample and give you enough time to see results from a product. This product is extremely overpriced for what it is. DO NOT ORDER UNDER ANY CIRCUMSTANCE unless you like your credit card being hit at any time unexpectedly."[34]

126.   Another victim said: "This is a scam. There is no free trial and you are signing up fir a monthly membership which you cannot get out of."[35]

127.   Another victim said: [36]

I made the mistake of sampling this product via an ad on Instagram (stupid, stupid move) for the cost of shipping & handling. Later, my credit card was charged upwards of $150 for a subscription. There is apparently fine print (which is visible now from a laptop but was NOT shown on the mobile phone view.) As far as I can tell, the product works and well, but I cannot imagine supporting a company with such malicious tactics. I've reported the company to Citibank and am still waiting to see whether the charges will be dropped. Some research after the fact shows that I am one of many to fall for their trap. There are other similar products that work whose companies seem far more honest. Skip this stuff.

128.   Another victim said: "Happened to me to. I will always check now on Amazon for these reviews. What a sham...I thought I bought it for $5. Now I am

---

[34] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R10N9HKJ2ODBN0/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=B06X NKS7L6 (last visited Dec. 16, 2019).

[35] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R3OD8G9X1F6G6U/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06X NKS7L6 (last visited Dec. 16, 2019).

[36] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R2UNWZN2N15T1S/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06X NKS7L6 (last visited Dec. 16, 2019).

paying $90 for it, paying for return shipping for another product, and totally scammed by this company. Fraud ALERT!"[37]

129.   On ReportScam.com, a victim posted a report titled "I have been scammed by nuvega lash" on May 2, 2017: [38]

> I found this website online, and on their site it only says rush my free trial, it doesn't say anything about having 14 days to cancel your membership or you will be charged 119$. Now when they charged my card on the last day I called and asked why was I being charged and the agent I talked to was very rude to me and told me he could only refund me back 59$ I asked to speak to a supervisor or manager and he went off and would not let me speak to anyone. Left me feeling horrible and robbed! I still haven't received a refund, I may have to just go dispute this at my bank.

130.   Another victim posted on ReportScam.com about signing up on trynuvegalashnow.com in a post titled "Fraud Company - Will add you without consent to their $99 monthly scam:"[39]

> Ordered their $14.99 product after seeing their ad on the internet. They started charging $99 from next month for a product I never authorized them to sent me on monthly basis. Their customer service is very shady, they initially kept telling me to take a discount and keep the product but in the end said that by their policy they can only return 25% and I have agreed to but their products.

---

[37] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R2UNWZN2N15T1S/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06X NKS7L6 (last Visited Dec. 16, 2019).

[38] Report Scam, https://reportscam.com/trynuvegalashnowcom (last visited Jan. 5, 2020).

[39] *Id.*

131.    A    victim    report    on    ReportScam.Com    titled    "Scammed    by
nuvegalashes" states that the Barone/Chumenko Group simply quit answering their
phone number: "I saw the advertisement for a free sample $5 shipping I tried it. It
never said anything about canceling. When I check my account they charged me
$95! When I called I was told I would be refunded. It's been 2 weeks and still no
refund and the company will no longer answer the phone!"[40]

132.    Another    victim    reported    their    experience    with    Nuvega    Lash    on
ReportScam.Com:[41]

> 'Free trial offer...just pay for shipping!!'

> I bought it, hook, line and sinker and ordered the "free trial". I get to
> the payment page and it shows me a brow enhancer and asks me to
> continue. I don't need brow enhancers as mine are already
> caterpillars!! I hit continue, 'BAM' another charge for S+H. There is
> no way to back up, they already have my credit card info.

> Pissed off by now but I receive my two tubes, lash and brow. They are
> exactly the same...matter of fact, if you pull the 'brow enhancer'
> sticker off it says lash enhancer!!

> I go online to see if anyone has left reviews on instructions for the
> product and find out I will be charged $119.99 + $9.99 S+H after a 14
> day trial. I had to dig around for a phone number to contact them
> because it is not easily available. Coincidentally, the number that was
> on one of the NuVega sites is an attorney's office. Maybe we should
> all hire them because I also found that these 'Free Trial Scams' are
> now being prosecuted and companies are paying out in the millions.

---

[40] *Id.*

[41] Report Scam, https://reportscam.com/nuvegalashescom (last visited Jan. 5, 2020).

> I digress...once finding the number I contacted customer service and they gave me a return number to return my trial products.
>
> No big deal! I am out $10.00 shipping and handling and will go nuts on someone if I am in fact charged.
>
> LESSON LEARNED!!

133.   Another victim warned on ReportScam.Com that despite promising to do so, the Barone/Chumenko Group refused to refund money to customers after shipping the product back—and that it was so common their local USPS office knew about the issue already: "The company failed to honor the written agreement for a refund for returned product (ADVANCEDLash) and failed to answer the USPS inquiry for receipt of returned item. Per local USPS, the company has a history of this practice."[42]

134.   On a website called Scamion, Nuvega Lash similarly has an active page with multiple user reports. One describes taking screenshots of the advertisement and there being no disclosure whatsoever of the subscription:[43]

> Nuvega Lash advertises a 'free trial' size bottle/tube, in which you only need to pay $4.99 S&H. So I think I'm just purchasing a 'free' sample of the serum, and naively enter my name, address, & credit card number. I go away for 2 months, & when I return, I find out they've charged my account $99.96 each month!

---

[42] Report Scam, https://reportscam.com/nuvega (last visited Jan. 5, 2020).
[43] Scamion, https://www.scamion.com/nuvega-lash-30 (last visited Jan. 5, 2020).

In shock, I try to call the number listed for them on my bank statement, & I was on hold for 10 min., then it hung up on me! I try to go to the web address listed for them on my shipping receipt, only to find out that the website no longer exists! So I'm now out $200 for what was apparently a 'subscription' of Nuvega lash that I in NO way knowingly authorized!

I have a screenshot of their Ad, and it says NOTHING on that Ad about a 14-day trial, in which after 14 days, I would be automatically charged $99.96 every month. How can this even be legal?

135.    Another victim posted on Scamion and described the financial hardship she suffered from the Barone/Chumenko Group's fraud: "Said it was a free trial. Made me pay $4.99 for shipping and kept charging my card $96 over and over. I called and told them I didn't want it and wasn't going to pay that much for eyelash serum. They told me to send the producr back, which I did, because I never opened it. Then they continued to bill me. I'm a single mom and can't afford to keep having them take money out of my account!"[44]

136.    Another victim reported on the Scamion page for Nuvega Lash:[45]

Bought product on Wish app got product. Then received some brow product I did not order and then received eyelash product and brow product one month from original product. I called company got the Ran# returned product both lash and brow product that I had been charged on my credit card for 97.89 and 99.96 I kept the initial lash and brow product returned the second lash and brow for the 30 day guarantee.

---

[44] *Id.*

[45] *Id.*

Which states if returned in 30 Day (I have a tracking number ). We'll refund your money less shipping and processing. I still have not received my refund Have contacted customer service 6 times No refund. Please help if you look on line this company Check via address is known for this. Very frustrated

137.   These are just a sample of the many complaints about Nuvega Lash across various websites. It is not a coincidence that so many victims are reporting the exact same thing: that they were told Nuvega Lash would be free, that they later discovered they had been billed hundreds of dollars for a subscription they did not sign up for, and that when they tried to cancel their nonexistent subscription, the company made it as difficult as possible to do so. This was how the Barone/Chumenko Group treated all of their victims—and the Nuvega Products were just a thin excuse to commit rampant credit card fraud.

**Misrepresentations Regarding Reviews and Endorsements**

138.   On information and belief, the Barone/Chumenko Group marketed the Nuvega Products exclusively through affiliate marketing networks, such that every customer who purchases a product from them will be exposed to and view the fake celebrity endorsements described herein. Ms. Adam specifically recalls viewing an advertisement stating that the products had been endorsed by Blac Chyna and relied on that in signing up for the "free trial."

139.   These celebrity reviews are material to the Barone/Chumenko Group's customers and their decision to purchase the products at issue. Because

these individuals are well-known with well-guarded reputations, portraying reviews as coming from them misleads customers into believing that the Barone/Chumenko Group's companies are a credible and well-established. Because these celebrities are generally beautiful with desirable appearances, the fake quotes suggesting that these celebrities obtained that appearance by using the Nuvega Products misleads customers as to the kinds of results they may expect from using the products.

### Misrepresentations and Omissions Regarding Free Trials

140. Another way the Barone/Chumenko Group deceives consumers on their websites is to suggest that they are signing up for a "free trial," when in fact they are not. The first page a victim would view is a website such as healthyhair.healthfindings.website/lash.html, which expressly states that consumers are signing up for a free trial. The second page a victim would view is the sign-up page on trynuvegalashnow.com/v2/, which describes the offer as a "trial," lists the price for the product as $0.00 with the customer only paying $4.99 for shipping and handling, and falsely represents that the customer will "just pay a small shipping fee."

141. On information and belief and based on the sales funnel structure, every customer who purchased Nuvega Products would have been exposed to these representations.

142. The Barone/Chumenko Group made material omissions regarding the "free trial" on their websites by omitting material information which they were under a duty to disclose relating to those trials. The Barone/Chumenko Group failed to disclose to consumers who viewed the websites that the trial was not in fact free, and that they were signing up for a subscription for the Nuvega Products. These terms were concealed by burying them inside a terms of service on a separate page on the website.

143. The Barone/Chumenko Group under a duty to Plaintiff and the Class members because they made partial representations—that the cost would be $0.00 and that all they would pay for was shipping and handling—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that there would be an ongoing subscription, that it would include more products than the one the victims signed up for, and that it would be for nearly $100 per month in total.

144. The Barone/Chumenko Group knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer

on the trynuvegalashnow.com/v2/ landing page and in any other places where references to a free or trial offer occurred.

145.   The Barone/Chumenko Group's omissions regarding the subscription payments were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known they were not signing up for a free trial or that the actual cost would be more than $100 per month if they did not cancel virtually immediately, they would not have agreed to the offer.

146.   Ms. Adam was damaged by these misrepresentations and omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of its terms.

### Representations Regarding Limited Supply

147.   The Barone/Chumenko Group's web pages include representations of limited supply, as described herein. But on information and belief, those purported limitations and the representations that there was "low stock," "limited quantities available," or that there were limitations on how many people could sign up for the product were false.

148.   These misrepresentations are designed to induce consumers to sign up for trials and to create a false sense of urgency. As a result of these misrepresentations, consumers purchase products they would not have or pay more

842182.2

for them than they otherwise would have, or they retain products for longer than they otherwise would have and are damaged by finding that they have been subjected to a subscription they did not agree to.

149.   The Barone/Chumenko Group's misrepresentations regarding their limited supply are material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations in deciding whether to purchase the products because if they knew that the products were not limited in supply and could be purchased at any time, consumers would not feel the need to sign up for a "free trial" on impulse and under time pressure that did not exist based on these representations. Plaintiff and the Class members thus reasonably relied upon these representations in making their purchase decisions.

## **Omissions Regarding the "False Front" Websites**

150.   The Barone/Chumenko Group deceived consumers' banks and credit card companies, by maintaining "false front" websites at the various URLs described herein. These sites were created intentionally to make it appear to outsiders that the victims of the scheme had been informed of their subscriptions and had consented to them. The Barone/Chumenko Group were under a duty to disclose to Plaintiff and the Class Members that they maintained these "false front" websites and to disclose that they routinely used those websites to deceive banks or

credit card companies to prevent consumers from exercising their right to a chargeback.

151. Plaintiff and the class were damaged by these omissions. All members of the class were damaged because had the banks and credit card companies not been unlawfully deceived, the scheme would have been shut down and none of the Class members would have been billed. The Barone/Chumenko Group further owed duties to all of the Class members to inform them that there were "false front" websites, and the failure to do so injured every member of the Class.

152. The Barone/Chumenko Group made material omissions regarding the "false front" websites by omitting material information which they were under a duty to disclose relating to those sites. The Barone/Chumenko Group failed to disclose to consumers who viewed the trynuvegalashnow.com website or its landing page at /v2/ that there were multiple other websites, that the Barone/Chumenko Group planned to intentionally deceive the consumer's banks or credit card companies if they attempted a chargeback, and that they were not bound by any of the terms or other disclosures on the trynuvegalashnow.com website.

153. The Barone/Chumenko Group were under a duty to disclose this information to Plaintiff and the Class Members because the Barone/Chumenko

Group had exclusive knowledge of material facts not known to them, namely that there were numerous other websites which were being used as a "false front."

154.   Plaintiff and the Class Members did not know this, and it was difficult to discover because that information was not located on the website they signed up for the trial from, because the trynuvegalashnow.com/v2/ website was designed to be inaccessible from its main page, and because the "false front" websites were placed on entirely separate URLs which were not linked to from the page on which the victims signed up for the trial.

155.   The Barone/Chumenko Group were under a duty to disclose this information to Plaintiff and the Class Members because the Barone/Chumenko Group engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. The Barone/Chumenko Group made efforts to hide their websites from view as described above, to make the landing page difficult to find, to delete various advertisements so customers could not find them again, and by creating the "false front" websites to conceal from their victims and others the actual landing page that the victims visited.

156.   The Barone/Chumenko Group were further under a duty to Plaintiff and the Class members because they made partial representations to the banks and credit card companies—that they had sold the Nuvega Products to their victims—but also suppressed, concealed, or did not disclose material facts that qualify those

representations, namely that none of the victims had actually signed up for the free trial on the websites which banks and credit card companies were presented. The Barone/Chumenko Group further made partial representations to Plaintiff and the Class members—that they would receive a free sample—without disclosing that if they attempted a chargeback, the Barone/Chumenko Group intended to lie about the terms of the agreement to their banks or credit card companies.

157.   The Barone/Chumenko Group knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the trynuvegalashnow.com/v2/ landing page, or in follow-up e-mails to their victims, or in proximity to their representations to banks and credit card companies.

158.   The Barone/Chumenko Group's omissions regarding the "false front" websites were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known that the Barone/Chumenko Group was maintaining  fake websites for the purpose of defrauding their banks and credit card companies, they would not have signed up for the "free trial."

159.   Ms. Adam was damaged by these omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of this information.

### The Barone / Chumenko Group

160.   In most free trial scams, multiple nominally distinct individuals and entities operate together to defraud their victims. The Nuvega Lash scam is no exception. The actual products at issue here appear to be made by (and trademarked by) a German or Swiss company called 8Alpha GmbH Corporation, and manufactured by a German company called Nutracosmetic GmbH.[46] On information and belief, Frank Barone and Kirill Chumenko have the rights to sell or distribute the Nuvega Lash products in the United States, and they do so through a series of shell companies.

161.   Barone and Chumenko have long been business partners in similar endeavors. On February 4, 2004, they both filed a patent together for a topical compound that purportedly enhanced male erections.[47] Through a company named Barmensen Labs LLC, they sold such products as a male erectile enhancer called

---

[46] https://trademarks.justia.com/868/41/nuvega-86841119.html;
https://cosmoprofnorthamerica.german-pavilion.com/en/exhibitors/79928
[47] U.S. Patent. No. 7,214,390 B2 (filed Feb. 4, 2004) (available at
https://patentimages.storage.googleapis.com/85/61/3c/10a733f512de10/US7214390.pdf).

Maxoderm, a weight loss powder called Alvitum, and a migraine supplement called Miprovil.[48]

162.   In roughly 2016, Barone and Chumenko began promoting the Nuvega Products for sale through a series of shell companies.

163.   These companies include, at a minimum, Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC.

164.   Collectively, these individuals and entities are referred to herein as the "Barone / Chumenko Group" (Frank V. Barone; Kirill Chumenko; Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC).

165.   Plaintiff expects that additional shell companies will be identified through discovery which Barone and Chumenko used to assist in the scam, in particular by utilizing their merchant accounts to avoid fraud detection in the sale of the Nuvega Products.

---

[48] Barmensen Labs Website Archive, https://web.archive.org/web/20070726145752/http://www.barmensen.com/ (last visited Jan. 28, 2020).

842182.2

166.   These shell companies do not follow corporate formalities and are operated as if they were a single entity or unit. For example, Green Pogo LLC purported to operate a website called greenpogo.com in 2016.[49] However, the trademark for the name of this website was held by Barmensen Labs LLC.[50] The product sold on greenpogo.com by Green Pogo LLC, Red Fortera, is trademarked by one of the other shell companies, Fortera Nutra Solutions LLC.[51] Red Fortera is sold by yet another shell company, Healthy Living Advancements LLC.[52] And as described further herein, the Barone/Chumenko Group routinely presented different shell companies as the seller of the Nuvega Products (and used those shell companies to bill victims from their own merchant accounts to avoid fraud detection by the victim's banks).

167.   Barone is directly involved in the management and operation of these shell companies, and exercises control over their activities in selling the Nuvega Products.

---

[49] Greenpogo.com Website Archive,
https://web.archive.org/web/20161001155646/http://greenpogo.com/ (last visited Jan. 28, 2020).
[50] Greenpogo.com Trademark Status,
http://tsdr.uspto.gov/#caseNumber=78895441&caseType=SERIAL_NO&searchType=statusSearch (last visited Jan. 28, 2020).
[51] Red Fortera Trademark Status,
http://tsdr.uspto.gov/#caseNumber=87061053&caseType=SERIAL_NO&searchType=statusSearch (last visited Jan. 28, 2020).
[52] http://redforteraondemand.com/ (last visited Jan. 28, 2020).

168. Barone's home address, 9 Crest Fruit Court, Manalapan, NJ 07726, is listed as the contact information for AdvancedLash, a product sold by Green Pogo LLC,[53] as well as Advanced Beauty LLC.

169. Barone's home address is also listed on the website lashesbynuvega.com as the contact information for Green Pogo LLC as the seller of Nuvega Lash.[54]

170. Barone's home address is also listed on the website nuvegavegan.com as the contact information for Improved Nutraceuticals LLC as the seller of Nuvega Lash.

171. Barone is a manager of Fortera Nutra Solutions LLC and Green Pogo LLC (New Jersey).

172. Chumenko is also directly involved in the management and operation of these shell companies, and exercises control over their activities in advertising and selling the Nuvega Products.

173. On information and belief, Barone and Chumenko jointly control and operate the shell companies to sell the Nuvega Products and other products.

174. Chumenko was sued in Miami-Dade County's 11th Circuit Court on April 20, 2018, along with Vegan Beauty LLC. The action was filed by an affiliate

---

[53] http://www.advancedlashbeauty.com/terms.html (last visited Jan. 2, 2020).
[54] https://lashesbynuvega.com/ (last visited Jan. 2, 2020).

network which had been advertising Nuvega Lash, The Affiliati Network, Inc.[55] This affiliate network alleged a breach of contract for a marketing contract which Kirill Chumenko and Vegan Beauty LLC entered into on January 12, 2017 to market the Nuvega Lash products.[56] The complaint attached a contract for affiliate marketing services signed by Mr. Chumenko on behalf of Vegan Beauty LLC as its Managing Member.[57] A number of invoices indicating that this affiliate network had been advertising the Nuvega Lash products on behalf of Mr. Chumenko and Vegan Beauty LLC were also attached.[58] According to those invoices, this affiliate network alone drove 2,265 victims to sign up for the Nuvega Lash "free trial" in the first few months of 2017—a number which likely amounts to hundreds of thousands of dollars stolen from those victims.

175. The websites shopnuvega.com, www.nuveganlashes.com, and www.nuveganbrows.com state at the bottom of the website that they are operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Chumenko's home address).

---

[55] Complaint, Affiliati Network Inc. v. Kirill Chumenko et al, No. 2018-012896-CA-01 (Fla. 11th Circuit Court Apr. 20, 2018).
[56] *Id.* at 3-4; *id.* at Ex. A.
[57] *Id.* at Ex. A.
[58] *Id.* at Ex. B.

176.    The Green Pogo LLCs—two identically named LLC's, one in New Jersey, the other in Delaware—are involved in the sale of the Nuvega Products, and are controlled and operated by Barone and Chumenko.

177.    The Amazon page for Nuvega Lash lists the seller as "Green Pogo, LLC."[59]

178.    Green Pogo LLC is listed on the website lashesbynuvega.com as the seller of Nuvega Lash.[60]

179.    The Green Pogo LLC Better Business Bureau page gives the company the lowest possible "F" rating. And its page is littered with customer complaints dating back to January 2017 through October 10, 2019, with victims describing exactly the same experience as Ms. Adam had.

180.    For example, a review from December 29, 2017 describes a victim's experience from start to finish:[61]

> I was on Facebook and this ad came on from this cosmetic company and I agreed to a one time $4.95 shipping charge of in product called Nuvega brow. Before I checked out I had to order another item that I didn't want it was the only way to check out on their site. As soon as I made the purchase I tried calling a phone number that was listed on this Facebook ad. There was a recording that said we appreciate your

---

[59] Nuvega Lash Amazon Page, https://www.amazon.com/Nuvega-Natural-Eyelash-Eyebrow-Growth/dp/B06XNKS7L6 (last visited Jan. 2, 2020).

[60] https://lashesbynuvega.com/ (last visited Jan. 2, 2020).

[61] Green Pogo LLC BBB Page, https://www.bbb.org/us/nj/manalapan/profile/online-retailer/green-pogo-llc-0221-90178228/complaints (last visited Jan. 2, 2020).

business please hold on and I heard that at least 18-20 times and each time I was disconnected. I called back at least 4 to 5 times and it happened exactly the same way and I could never get in touch with the company. So I called my ******** credit card open a dispute. The company sent information regarding my order and said I never called them to cancel so they charged me after the initial delivery on October 26, I was supposed to have 18 days to call them, and finally I did receive all the information that ******** was provided and I called them on November 9 to cancel. That was the same day they charged my credit card for $92.94. I forgot to tell city bank that I called on November 9 to cancel so they sided with this scam of the company. I'm not happy because I tried my very hardest to contact the company first and when I couldn't get through, that's when I called ********. I have tried three times to talk to representatives from the company and they are saying they cannot give me a refund. The whole situation and this company is one big scam and as a senior I don't have $92.94 but they won't work with me.

181.    Another victim of Green Pogo LLC wrote on January 3, 2017: "I signed up and paid the shipping on a FREE trial of their product. If I keep the 'FREE' trial that they sent, I will get billed for the FULL amount of the product. They are saying the trial period to use their product is FREE. This is a scam. If you offer something for free.. that means it's FREE, no cost. So I said I would return it because they want it back. I believe they should send a shipping label if they want it back. Why should I have to pay to send something back that was supposed to be FREE. This is a terrible company."[62]

---

[62] *Id.*

182.    Another Green Pogo LLC victim reported also experiencing the tactic

of pretending that there was no manager on duty to speak to:[63]

> Nuvega had an offer for "free trial" of Nuvega Lash which was
> supposed to help my eyelashes grow-which it did not-not only did
> they include a product I didn't ask for, after 14 days or so they
> charged full price for the "free" trial. It's apparently in the contract.
> However I spoke with someone at nuvega about the insane price of
> $94.00 for something I thought was free, she failed to mention that I
> was on a plan that would send me a new bottle every month & charge
> me $99.96 every month. I called again & was told I would only get
> 25% of a refund because I didn't use this new bottle. I find that
> outrageous. That amount of money is a lot for someone like me & the
> customer service was terrible, there was no manager on staff for me to
> speak with so apparently they are also working unsupervised, which is
> even worse.

183.    Another victim reported repeatedly attempting to cancel the

subscription with Green Pogo LLC, only to be charged four more times without

even being sent the Nuvega Products they were supposedly subscribed to:[64]

> I am so frustrated with the company GREEN POGO that has
> fraudulently charged on three of my credit cards. We payed for and
> received a trial but did not approve of further shipments or charges.
> They sent only 4 packages but keep billing me exuberant charges as
> noted above without sending more product. I called with a ****
> represented to cancel on 10/31/2016. They answered the phone once
> but disconnected, and wouldn't answer again with the ****
> representative on the line. **** told me to dispute the charges. I was
> told by the **** representative not to change my credit card number
> and that no further charges would be allowed to bill to my credit cards
> due to the disputes, yet I received no more product and was charged 4
> more times, twice on each credit card. I called **** in Nov. again to

---

[63] *Id.*
[64] *Id.*

make sure no further charges were being made and I cancelled the card numbers when we found more charges. Although, I was assured I wouldn't get charged again with a dispute open. I again called and spoke to **** last wed, and they promised to follow up and call me back. When I didn't receive a call back, I called today again on both cards. Two disputes were recharged before I even had a call back from ****. The **** representative and I called the GRNPOGO company together. They couldn't or wouldn't find all my accounts and check if they received the product back. I asked for a Rma number if I could track the packages and they refused. I called GRNPOGO to try and get a rma number to return the product and now they say since we disputed (which **** advised me to do) they will not issue a rma number or let me return the product. So frustrating, they change their response everytime we call.

184.   Green Pogo LLC was not the only shell company victims were billed by. Fortera Nutra Solutions LLC, formerly Next Gen Health Solutions LLC, was also used by Barone and Chumenko to bill victims of the Nuvega Lash scam as part of their scheme to prevent banks from discovering the fraud.

185.   The Better Business Bureau page for Next Gen Health Solutions LLC, now Fortera Nutra Solutions LLC, reveals a number of victims complaining that the company billed them for subscriptions to the Nuvega Products. The company received the lowest possible "F" rating.

186.   For example, on October 24, 2018, a victim complained that Fortera Nutra Solutions billed them hundreds of dollars for Nuvega Lash after falsely

telling them that the product would be free:[65]

> If I could give them zero stars I would. I paid $4.99 for my FREE Nuvega Lash and received it along with a letter stating once my trial is complete I would have to pay for the product! Do not believe anything this website tells you. After calling to cancel my alleged membership which i did not agree to they told me I had to pay to return their product and would not be receiving a refund for the 'FREE' product that I did not use. They are liars, and do not disclose all information on their website. Do not purchase from this website unless you want to be charged a monthly supply of $324.00!!

187.   On December 19, 2017, a victim reported that Fortera Nutra Solutions LLC billed them $400 for a "lash treatment" without disclosing that there would be an auto-shipment:[66]

> Ordered lash treatment item was received back in September for a trial price of $14 and then I was billed $94 for another item the next month and $99 the following month. There was NO clarity that there was an auto-ship that would be for almost $100 every month that you HAVE TO CALL TO CANCEL. I never recieved a written/paper copy of these terms and it honestly needs to be STATED UP FRONT not hidden in the terms and conditions! I contacted customer service and informed them. They would not listen to my concerns and kept pushing discounts to keep me as a customer...i'm sorry NO...i'm not paying your ridiculous prices for a product that didn't even work. Now i'm out almost $400. NOT HAPPY.

---

[65] Next Gen Health Solutions LLC BBB Page, https://www.bbb.org/us/nj/morganville/profile/vitamins-and-supplements/next-gen-health-solutions-llc-0221-90181958/customer-reviews (last visited Jan. 29, 2020).

[66] *Id.*

188.   On January 31, 2018, a victim reported that Fortera Nutra Solutions LLC billed them for Nuvega Lash without sending any product, then refused to cancel a subscription despite multiple calls requesting to cancel:[67]

I ordered a trial sample of Nuvega Lash on 10/12/17 and was charged $4.99. It wa supposed to be a 30 day trial. They proceeded to charge my card and additional $94.97 on 10/31/17 and did not send any product. I called a million times to cancel and get a refund and was put on hold listening to music. I called twice more on 2 seperate occasions and the same thing happened. I admittedly forgot about it until I recieved another tube right before the new year and then realized I was yet again charged another $99.96 on 12/12/18. I immediately called and got through to a gentleman with a thick accent who's name I could not understand. He said he could not process a refund as it was past the 30 day trail period!!!!!! He did supposedly cancel my account. We argued for a bit and he said the best he could do was refund half of one shipment which was $49.98(CONFIRMATION #*****). I proceeded to tell him this was false advertising and ended up hanging up on him. I called a week later(second week of January) to ask why I had not recieved any refund and was told that it was processed and to wait a few more days. I just called today(1/31/18) and spoke with Diego. I complained I had not recieved anything and he said he would re-process the refund of $49.98(which is ridiculous as they stole over $200 from me) (CONFIRMATION #**********)and I should expect it in 7 to 10 business days. I did a little research and found out this company keeps switching names, hence the reason why it is reported as OUT OF BUSINESS on the BBB site. They have also gone by the names Improved Nutraceutical, Nuvega Lash and V Beauty to name a few. How have they been able to continue this pattern and no one has caught on? This whole situation is extremely upsetting. SUCH A SCAM.

---

[67] *Id.*

189.   Multiple other victims reported to the BBB that they were scammed by Fortera Nutra Solutions LLC for subscriptions to Nuvega Lash or to unnamed eyelash products.

190.   The Barone/Chumenko Group's failure to follow corporate formalities and use of their various shell companies confused at least one recipient of a refund check from Next Gen Health Solutions LLC (now Fortera Nutra Solutions LLC) because the Barone/Chumenko Group also identified the check as coming from one of the other shell companies, Improved Nutraceuticals LLC:[68]

> Received mail on 23 April 2018 from sender "Next Gen Health Solutions LLC, 500 Campus Drive Suite 203, Morganville, NJ, 07751". Only contents inside the envelope was a check addressed to my wife in the amount of $99.96. The only identification on the check sender was 'IMPROVED NUTRACEUTICALS LLC'. My wife and I discussed that we had not done any business with this company and became suspicious since there was no explanation correspondence with this check. We did not cash the check. Research on the ScamPulse.com website indicates that this company has a rating of "F". One of the posted ratings indicates in detail that the individual appears to have been taken advantage of by the company, charging their checking account, not responding to phone calls to resolve the problem. It appears that this company still is trolling for targets. Next Gen Health Solutions LLC, also is listed as contact info for Red Fotera: redfotera.com 800-908-6213.

191.   Advanced Beauty LLC is the company behind a product called Advanced Lash, also sold by Barone and Chumenko. On information and belief, a

---

[68] ScamPulse, https://www.scampulse.com/next-gen-health-solutions-llc-reviews (last visited Jan. 8, 2020).

842182.2

merchant account attributable to this shell company was used to bill Plaintiff Adam and other members of the Class under the name "Advancedlash." The manufacturer of the Nuvega Products, Nutracosmetic GmbH, has repeatedly shipped imported cosmetics to Advanced Beauty LLC.[69] On information and belief, those shipments contained the Nuvega Products, and Advanced Beauty LLC aided the other entities in the Barone/Chumenko Group by assisting in the distribution of those products to victims.

192.    Natural Beauty Line LLC operated the websites shopnuvega.com, www.nuveganlashes.com, and www.nuveganbrows.com, and on information and belief, was used as one of the shell companies whose merchant accounts were cycled through in billing for the Nuvega Products to avoid fraud detection.

193.    The Better Business Bureau page for Natural Beauty Line LLC features complaints relating to the sale of Nuvega Lash. For example, a victim complained that after signing up for a trial of Nuvega Lash, Natural Beauty Line LLC shipped them products which the victim did not order:[70]

---

[69] Import Genius Summary for Advance Beauty,
https://www.importgenius.com/importers/advance-beauty (last visited Jan. 8, 2020).
[70] Natural Beauty Line LLC BBB Page,
https://www.bbb.org/us/nj/manalapan/profile/beauty-supplies/natural-beauty-line-llc-0221-90185499/complaints (last visited Jan. 29, 2020).

I ordered some Nuvegalash trial for $4.99 in September 2018. I was forwarded some lash, & brow which I didn't order. The rep said she wasn't able to get my credit card to process so I asked her to cancel the order anyway. My acct was charged $94.97 on 9/24. I returned the products not satisfied with an RMA# on 10/5. It was delivered to the return address, ** ***** ******* *********** *****, on October 9, 2018. I called and spoke to Natalie, guess that was her name!, on 10/26 and she said the products has been received and the refund was in process and to check with my bank. I did and still no word from them to the bank so I filed a dispute. Bank of America then gave me a refund of $94.97 and investigated or said they did. On 12/24/2018 BOA charged my account back at $94.97 until they figured it out,I guess. I shared with BOA local rep the verification of return and receipt of products by the company. So there is very valid note company receiving the return of the products. Bank of America has closed the case and I have still not received my refund. I am hoping this group is investigated as soon as possible.

194.   Improved Nutraceuticals LLC operates the website nuvegavegan.com, and on information and belief, was used as one of the shell companies whose merchant accounts were cycled through in billing for the Nuvega Products to avoid fraud detection.

195.   The Barone/Chumenko Group (Frank V. Barone; Kirill Chumenko; Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC) formed a joint venture, and each of the members of that joint venture, as well as the joint venture itself, are jointly and severally liable for the wrongful conduct of any members acting in furtherance of the venture.

196.   The Barone/Chumenko Group combined their property, skill, and knowledge with the intent to carry out a single business undertaking. That business undertaking was selling the Nuvega Products and operating the related websites, led by Frank V. Barone and Kirill Chumenko (who ultimately own and control the other corporate entities).

197.   Each individual and entity within the Barone/Chumenko Group has an ownership interest in the joint venture. On information and belief, Frank V. Barone and Kirill Chumenko are the ultimate owners of the group of companies. Such agreement is further implied by the members' conduct in creating and controlling the various websites promoting and selling the Nuvega Products.

198.   On information and belief, Barone and Chumenko have joint control over the Barone/Chumenko Group, or agreed to delegate that control. Such control is implied by the member's conduct because both Frank V. Barone and Kirill Chumenko are members or managers of the shell companies selling the Nuvega Products, because their home addresses were used as the business addresses for those companies, because corporate formalities were not followed by Barone and Chumenko, and because of the longstanding business relationship between Barone and Chumenko.

199.   The Barone/Chumenko Group have an agreement to share the profits and losses of the joint venture. Such agreement is implied by the members conduct

because of the overlapping corporate ownership and decision-making structure.

## **Great Lakes Fulfillment Services Defendants**

200.   Essential to the Nuvega scheme is Great Lakes Fulfillment Services, now SFLG, Inc. ("Great Lakes Fulfillment Services").

201.   Great Lakes Fulfillment Services was founded by Defendant Kurt Ellis in 2002, who served as President of the company until it was acquired in August 2019 by Jet Mail Services.[71] As of August 2019, Mr. Ellis had agreed to remain with the company as its President.[72] On information and belief, Great Lakes Fulfillment Services was a smaller company throughout this period, and Mr. Ellis was intimately familiar with its operations and its customers.

202.   Defendant Ellis and Defendant SFLG, Inc. (the "Great Lakes Fulfillment Services Defendants") operated as the fulfillment company for the Barone/Chumenko Group. The Great Lakes Fulfillment Services Defendants shipped the Nuvega Products to consumers, handled returns and customer complaints via mail, and on information and belief provided other services including consulting on business processes and generally assisting the scheme.

---

[71] *Jet Mail Services to Compete in the E-Commerce Fulfillment Sector*, POST AND PARCEL, Aug. 20, 2019 at https://postandparcel.info/112643/news/e-commerce/jet-mail-services-to-compete-in-the-e-commerce-fulfilment-sector/ (last visited Dec. 11, 2019).
[72] *Id.*

203.   Great Lakes Fulfillment is listed as the "Return Department" for Nuvega Lash on the Contact page of trynuvegalashnow.com/v2/: "Attn: NUVEGA LASH/BROW Return Department. Great Lakes Fulfillment 41 Canal Street Lewiston, ME 04240."[73] It is likewise listed as the "Return Department" in the Terms of Service.[74]

204.   Great Lakes Fulfillment is listed as the Return Department for AdvancedLash, a product sold by Green Pogo LLC. [75]

205.   Great Lakes Fulfillment is listed as the "Return Department" for Nuvega Lash on the websites lashesbynuvega.com;[76] www.nuveganlashes.com;[77] www.nuvegavegan.com;[78] www.nuveganbrows.com;[79] www.shopnuvega.com;[80] www.browbynuvega.com;[81]                         www.bestveganlash.com;[82] www.bestveganbrow.com;[83] and www.nuvegalashforvegans.com.[84]

---

[73] https://trynuvegalashnow.com/v2/page-contact.php (last visited Jan. 2, 2020).
[74] https://trynuvegalashnow.com/v2/page-terms.php (last visited Jan. 2, 2020).
[75] http://www.advancedlashbeauty.com/terms.html (last visited Jan. 2, 2020).
[76] https://lashesbynuvega.com/contact.php (last visited Jan. 24, 2020).
[77] https://www.nuveganlashes.com/contact.php (last visited Jan. 24, 2020).
[78] https://www.nuvegavegan.com/ (last visited Jan. 24, 2020).
[79] https://nuveganbrows.com/ (last visited Jan. 24, 2020).
[80] https://shopnuvega.com/ (last visited Jan. 24, 2020).
[81] https://www.browbynuvega.com/ (last visited Jan. 24, 2020).
[82] https://www.bestveganlash.com/ (last visited Jan. 24, 2020).
[83] https://www.bestveganbrow.com/ (last visited Jan. 24, 2020).
[84] https://www.nuvegalashforvegans.com/ (last visited Jan. 24, 2020).

842182.2

206. On information and belief, Defendants Ellis and SFLG, Inc. were well aware that the Barone/Chumenko Group were operating a "free trial" scam and were billing their customers for subscriptions without obtaining permission to do so, and were deceiving their customers into believing that they would pay "$0.00" for the products they had signed up for.

207. Because Great Lakes Fulfillment Services was responsible for handling the returns of the products, it would have been the recipient of consumer complaints, and on information and belief it did receive such complaints. In fact, the Great Lakes Fulfillment Services website makes clear that they handle returns themselves and then convey information about those returns to their clients: "Why worry about where your packages are going, freight optimization, logistics, handling returns and inventory on your own when you have so many other things to concentrate on? We will convey that information to you on a daily basis or as per your specific needs."[85]

208. Great Lakes Fulfillment Services provides a suite of solutions to its customers that provide a turn-key service for anyone looking to sell a product with minimal involvement in the process. Those services include "Returns Processing," "Continuity/Autoship programs," "Order Management System," "Database

---

[85] Great Lakes Fulfillment Services, https://www.glfulfillment.com/ (last visited Jan. 12, 2020).

Management," "Inbound Call Center," "Merchant Processing," and "Payment Processing," among others.[86] On information and belief, Great Lakes Fulfillment Services provided these services to the Barone/Chumenko Group in connection with the Nuvega Products. And because of the detailed knowledge of the business (and its credit card processing activities) these services imply, the Great Lakes Fulfillment Services Defendants could not have escaped intimate knowledge of the fraud perpetrated by the Barone/Chumenko Group, and did have such knowledge.

209.   In fact, Great Lakes Fulfillment Services advertises a testimonial on the main page from one of their customers, the "Owner and CEO" of NetMarkets LLC. The testimonial promises that Great Lakes Fulfillment Services is not just a fulfillment company, but that they take customers under their wing and help them develop their business processes:[87]

> When we started our direct response supplement company in 2011, we knew nothing about the business. Thank goodness a major player in the space introduced us to Great Lakes Fulfillment, as we didn't even know who to go to, and they were the first fulfillment company we had ever worked with. **They "took us under their wing" and helped us understand the right way to get our orders processed correctly**. **Not only that, but over the next few years as we started growing and we had ideas about things we'd like to try to do to streamline our processes, Great Lakes stepped up with custom programming and procedures to help us really serve our**

---

[86] Great Lakes Fulfillment Services, https://www.glfulfillment.com/glf-services (last visited Jan. 16, 2020).

[87] Great Lakes Fulfillment Services, https://www.glfulfillment.com/ (last visited Jan. 12, 2020).

**customers in the best possible way.** At Great Lakes, they know that our #1 goal is to treat our customers like royalty... and Great Lakes consistently helps us achieve that mission every day. We can't say enough great things about them.  We are on track to have a record year in sales in the next 12 months, and there is no one we would trust that growth to more than Great Lakes.

210.   But NetMarkets LLC, the customer who Great Lakes Fulfillment Services "took under their wing" and brags about helping to grow and to develop their processes and procedures, itself is operating free trial scams.[88] NetMarkets LLC sells three products: Biogeniste, Juvamend, and NO2 Maximus.

211.   Biogeniste racked up numerous complaints by consumers claiming that they were victims of the exact same kind of free trial scam that the Barone/Chumenko Group operate. For example, a customer of Biogeniste said: "Biogeniste is perpetrating a classic fraud and scam! They offer a 'free' sample, get your credit card info and then charge you $89.76 plus $5.95 for an unwanted follow-up shipment as if you became a subscriber for their supposed 'anti-wrinkle cream'. These people are a typical example of American Greed, they should be banned from commerce and put in jail."[89]

---

[88] NetMarkets LLC Better Business Bureau Page,
https://www.bbb.org/us/ny/brooklyn/profile/health-products/netmarkets-llc-0121-135028/complaints (last visited Jan. 12, 2020).
[89] Biogeniste Amazon Page, https://www.amazon.com/BioGeniste-Instant-Wrinkle-Reducer/product-reviews/B0076KS6NU (last visited Jan. 12, 2020).

212.   Biogeniste operated both a "false front" home page with a prominent link to the terms of service,[90] as well as landing pages for victims with that link removed.[91]

213.   Juvamend is likewise a classic version of the free-trial scam—complete with a "false front" home page where victims purportedly agreed to the terms of service,[92] a separate landing page which removed the link to the terms of service and the box requiring customers to agree to it,[93] and affiliate networks sending victims to the landing page where they would be unaware of the terms.[94]

214.   Similarly, NO2 Maximus has both a "false front" which requires customers to agree to a prominent terms of service,[95] as well as a separate website

---

[90] Biogeniste Home Page,
https://web.archive.org/web/20140207233332/http://biogeniste.com/ (last visited Jan. 17, 2020).

[91] Biogeniste Landing Page,
https://web.archive.org/web/20140211200157/http://www.biogeniste.com/200JB/index1.php (last visited Jan. 17, 2020).

[92] Juvamend Home Page,
https://web.archive.org/web/20130417081643/http://tryjuvamend.com/ (last visited Jan. 17, 2020).

[93] Juvamend Landing Page,
https://web.archive.org/web/20130404235856/http://www.tryjuvamend.com/20W/index.php (last visited Jan. 17, 2020).

[94] Cactus Media Facebook Page,
https://m.facebook.com/cactusmedia/posts/433813593365539 (last visited Jan. 17, 2020).

[95] NO2 Maximus Body Website, https://no2maximusbody.com/ (last visited Jan. 17, 2020).

842182.2

which does not contain the click box and does not notify customers of the subscription.[96]

215.   This is who the Great Lakes Fulfillment Services Defendants "took under their wing"—and who they chose as their primary reference account to attract new customers in this "industry." It is no surprise that the deceptive tactics NetMarkets LLC was using found their way to the Barone/Chumenko Group, and on information and belief the Great Lakes Fulfillment Services Defendants taught the "false front" technique and other methods of fraud to the Barone/Chumenko Group.

216.   The Great Lakes Fulfillment Services Defendants' role in handling product returns means that they necessarily would have had knowledge of customer complaints about the Nuvega Products. On information and belief, they would have received numerous complaints similar to the ones flooding various Internet pages regarding the Nuvega Products.

217.   In fact, Great Lakes Fulfillment Services' description of itself on its Better Business Bureau page makes clear that the company was receiving complaints from customers: "Great Lakes Fulfillment (GLF) is a 3rd party fulfillment center.  GLF packages and ships the orders only and is not involved with processing orders, billing, or refunds.  UPS requires GLF to put their name

---

[96] NO2 Maximus Website, http://no2maximus.com/ (last visited Jan. 17, 2020).

and address on all packages shipped by their service.  For complaints involving these issues please file against the business from whom you purchased the products originally."[97]

218.   Not only is this statement evidence of the Great Lakes Fulfillment Services Defendants' knowledge that victims were complaining, it is itself an intentional act of deception designed to hide their role in the fraud: the Great Lakes Fulfillment Services Defendants falsely told victims and the Better Business Bureau that "GLF packages and ships the orders only and is not involved with processing orders, billing, or refunds" when its website makes clear that it provides an "Order Management System," "Payment Processing," "Merchant Processing," "Returns Processing," and an "Inbound Call Center."[98]

219.   The Yelp Page for Great Lakes Fulfillment Services features multiple negative reviews blasting the company for its involvement in free trial scams. On information and belief, the Great Lakes Fulfillment Services Defendants were aware of these reviews and yet continued to participate in the fraud, acting as a consultant not just to the Barone/Chumenko Group but to a wide variety of Internet scammers operating similar schemes.

---

[97] Great Lakes Fulfillment Services BBB Page, https://www.bbb.org/us/me/lewiston/profile/merchandise-warehouse/great-lakes-fulfillment-services-0021-103120 (last visited Jan. 17, 2020).
[98] Great Lakes Fulfillment Services, https://www.glfulfillment.com/glf-services (last visited Jan. 16, 2020).

842182.2

220.   A victim of an unidentified scam posted on the   Great Lakes Fulfillment Services Yelp page on November 22, 2019: "This is a scam operated company, they advertise a 30 day supply of product, for 9 dollar shipping cost, then without notice charged my card  $90.00 plus , so the 30 day supply is not true for the shipping cost !! I will pursue a complaint with the better business bureau and state govonors office !!"[99]

221.   Another victim posted regarding another scam that was apparently being shipped through Great Lakes Fulfillment Services:[100]

> The name that these people operate under is Ortho Molecular Therapeutic Research.  They take your $$ but then are very slow to send out the product.  Then the order was CANCELLED BEFORE it was even shipped, however, they sent it anyway and then said "try it, try it".  The product doesn't work then when you try to get your $$ back, that is when the nightmare begins.  DO NOT SEND THESE PEOPLE YOUR MONEY!!  They force you to take the shipment then when you return it, they fight you on giving you back your money. Apparently at this company, the laws of common sense cease to exist as it takes them 2 months to refund you your money.  But when you ask them about it, they lie and say 4-6 weeks even though months have passed.  This will not be the last time you hear from me unless you refund my money immediately.  I know its hard to let go of that well earned scammed money, but do the right thing.  Better Business is next on my list.

222.   A victim of an unknown scam wrote on January 9, 2019 that: "this place is a sham.  I ordered pills and tried to return them and they didn't accept

---

[99] Great Lakes Fulfillment Services Yelp Page, https://www.yelp.com/biz/great-lakes-fulfillment-services-lewiston (last visited Jan. 17, 2020).
[100] *Id.*

842182.2

them."[101]

223.   And one victim wrote on May 7, 2014 to personally attack Defendant

Ellis for his role in the fraud:[102]

> The point of these sites is to get your credit card data, full stop.  He
> will say/do anything to get that and then, "buh-bye".  Pure scam.
> Nothing of value being offered.  Lots of pseudo-science and fuzzy
> logic.  But it's about getting the credit card, not health.
>
> The guy behind this runs lots of health connected sites, all cons. The
> umbrella "business" is "Great Lakes Fulfillment Service" which
> actually ships the crap. All cons, he's behind The Diet Spray LLC,
> Veloura International, Natural Health Network Postage only Trial, AU
> Esentials, Inc., Garcinia Cambogia 360, Inc. None of those trade
> names are registered or authorized to transact business in the State of
> Maine, so go no further to see that he is, in fact, a crook. The
> following is his contact information. The second contact is his lawyer.
> Between these two you can serve legal notices or just pay a visit and
> say howdy.
>
> Kurt Ellis
> 41 Canal St, 3rd Floor
> Lewiston, ME, 04240

224.   The victim proceeded to provide additional contact information

regarding Defendant Ellis and the name and contact information for his lawyer.

This victim posted the same review to a website called Ripoff Report, again

---

[101] *Id.*
[102] *Id.*

personally calling out Defendant Ellis as a "crook" and a "con."[103]

225.   Another victim posted on Ripoff Report on June 18, 2014 to report Great Lakes Fulfillment Services by name and address for its involvement in a scam. After listing the company's name and address in a report titled "Great Lakes Fulfillment Service Garcinia Cambogia 360 Free Bottle Scam Lewiston Maine," the victim stated:[104]

> I saw an ad for Garcinia Cambogia 360 which said that you could get a risk-free bottle of the supplement and all you had to pay was shipping and handling.
>
> The product looked promising so I went on their website and ordered my free bottle and paid the $5.95 necessary.
>
> Nowhere on the order form did it say that this was a time-limited free trial and that if I did not cancel within 13 days that I would be charged $87.97 for the bottle containing 30 pills that I was supposed to have gotten for free.
>
> I tried the product twice and it actually made me nauseaus, so I stopped using it but thought nothing of it since it was supposed to be a free bottle and I was only out $5.95...
>
> This was less than 1 month ago, and today I just got charged another $87.97 for another supposed shipment that I did not sign up for.

---

[103] Ripoff Report, https://www.ripoffreport.com/reports/great-lakes-fulfillment-service/lewiston-maine-04240/great-lakes-fulfillment-service-the-diet-spray-llc-veloura-international-natural-health-1144806 (last visited Jan. 17, 2020).

[104] Ripoff Report, https://www.ripoffreport.com/reports/great-lakes-fulfillment-service/lewiston-maine-04240/great-lakes-fulfillment-service-garcinia-cambogia-360-free-bottle-scam-lewiston-maine-1155638 (last visited Jan. 17, 2020).

I called customer service and the representative kept trying to get me to stick with the Auto-Shipment program that I did not sign up for. After a while she did cancel my account and gave me the RMA# necessary for returns as well as the return address where I have to send the shipment to once I receive it.

I am only going to be refunded the $87.97 that I got charged today, but they will not refund the other $87.97 even though that first shipment was supposed to be free.

Had I known that I was going to end up being charged that ridiculous amount I would never have even ordered the supposed "free" bottle.

Buyers be ware... If it sounds too good to be true it probably is.

These people need to be held accountable for this scam!!!

226. In a review on RipOffReport posted on April 11, 2009 and titled "Acai Advanced - GLF ,Great Lakes Fulfillment Acai Advance 'free' trial is a scam. You are charged before trying product Lewiston Maine," a victim reported:[105]

Acai Advanced baits you in with a "Risk Free" 15 day trial offer. I received the product 2 days before the 15 days was up, and my credit card was charged in full. I called the 800 # to cancel, put on hold, no one ever answered. Up to 1 hr 40 min on hold. Sent several e-mails, no replies. To keep from being "ripped off" again, I had to cancel my credit card.

This is no "Risk Free" trial offer. They get you to pay for S/H and then charge you in full long before trail ends. You can't cancel your automatic subscription because they don't answer and don't respond.

---

[105] RipOff Report, https://www.ripoffreport.com/reports/acai-advanced-glf-great-lakes-fulfillment/lewiston-maine-04240/acai-advanced-glf-great-lakes-fulfillment-acai-advance-free-trial-is-a-scam-you-are-442784 (last visited Jan. 24, 2020).

227. Multiple other complaints refer to the Great Lakes Fulfillment Services Defendants' address as the location for other free trial scams, even if the victims did not know their name.[106]

228. The Great Lakes Fulfillment Services Defendants must have known about these various reviews and complaints. Several of them specifically named Mr. Ellis and one provided personal contact information for Mr. Ellis and for his lawyer, urging victims to "pay a visit and say howdy." A search for their own business name or street address would have revealed all of these complaints. And their intimate role as business consultants for these scammers (among the other services they provide) would have given them knowledge of the fraud they were enabling.

229. On information and belief, Defendants Ellis and SFLG, Inc. were acting as consultants to assist free trial scammers in operating their scams in order to generate shipping business, and they did so from at least 2009 through the

---

[106] RipOff Report, https://www.ripoffreport.com/reports/acai-advanced-glf-great-lakes-fulfillment/lewiston-maine-04240/acai-advanced-glf-great-lakes-fulfillment-acai-advance-free-trial-is-a-scam-you-are-442784 (last visited Jan. 24, 2020); RipOff Report, https://www.ripoffreport.com/reports/024-pain-management/lewiston-maine-04240/024-pain-management-revive-bioscience-uk-c0-glf-biosceince-uk-co-glf-41-canal-st-lew-925761 (last visited Jan. 24, 2020); RipOff Report, https://www.ripoffreport.com/reports/024-pain-management/lewiston-maine-04240/024-pain-management-revive-bioscience-uk-c0-glf-biosceince-uk-co-glf-41-canal-st-lew-925761 (last visited Jan. 24, 2020).

842182.2

present. And on information and belief, Defendants Ellis and Great Lakes Fulfillment Services acted as consultants to assist the Barone/Chumenko Group in defrauding consumers of the Nuvega Products, knew that the fraud was occurring, and intentionally continued to aid and support the Barone/Chumenko Group in their fraud despite this knowledge.

230. Defendants Ellis and SFLG, Inc. committed intentional acts by shipping products to victims of the Nuvega Scam, accepting and processing returns and complaints from victims of the Nuvega Scam, consulting for the Barone/Chumenko Group on sales that they knew would be made to Nuvega Scam, and otherwise providing the services listed on their website in connection with Nuvega Scam.

231. These intentional acts were expressly aimed at people who would purchase Nuvega Products. Defendants Ellis and SFLG, Inc. knew where each victim was located by virtue of their shipping addresses and other contact information. These acts involved ongoing, systemic, and continuous acts because the shipment of Nuvega Products occurred from at least late 2016 through late 2019, a three-year period. Those shipments occurred as part of subscriptions, meaning that Defendants Ellis and SFLG, Inc. shipped continually and regularly to their victims over long periods of time. The acts were entirely commercial in nature, as Defendants Ellis and SFLG, Inc. marketed themselves as providing these

services specifically to companies they knew would sell nationwide via the Internet.

232.    Defendants Ellis and SFLG, Inc. generated substantial profits from their intentional assistance to the Barone/Chumenko Group in placing the Nuvega Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by consumers nationwide.

233.    Defendants Ellis and SFLG, Inc. knew or should have foreseen that their actions would cause harm to people who purchased Nuvega Products. As described above, they intentionally assisted "free trial" scammers over a lengthy period of time. They provided various services for a three-year period to the Barone/Chumenko Group knowing that consumers were being harmed by the scam nationwide, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges. Had they not provided these services, the consumers would not have been harmed because the Nuvega Products would not have been shipped to them and the Barone/Chumenko Group would not have benefitted from the experience of Defendants Ellis and SFLG, Inc. in helping other "free trial" scammers design their business processes.

## CLASS ACTION ALLEGATIONS

234.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

235.   Plaintiff brings this class action pursuant to Fed. R. Civ. P. Rule 23, seeking certification of Plaintiff's claims and certain issues in this action on the Class, consisting of:

> **Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Nuvega Products.

236.   Plaintiff further seeks certification of the following sub-class:

> **California Class:** All consumers in California who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Nuvega Products.

237.   "Nuvega Products" means Nuvega Lash, Nuvega Eyelash Serum, Nuvega Brow, Nuvega Eyebrow Serum, Advanced Lash, Evolips, and Evolips Volumizing Gloss. Plaintiff expects that this definition will be modified in discovery as additional information is obtained. In particular, Plaintiff expects that there may be other products sold by the Barone/Chumenko Group through Defendants with the exact same formulation, similar or identical injuries, but different labels or names. Plaintiff further expects that the conduct of the affiliates, the Barone/Chumenko Group, the Defendants, or the "crooked processors" may be subject to a different and much broader class that encompasses identical injuries that go beyond this specific product line.

238.   Excluded from the Class are governmental entities, any entity within the Barone/Chumenko Group, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

239.   Plaintiff reserves the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

240.   <u>NUMEROSITY</u>: Plaintiff is informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of consumers of injured by similar or identical Products shipped by the Defendants would be so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

241.   <u>COMMONALITY</u>: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Class were and

are similarly affected by having purchased and used the Products, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.

242.  <u>PREDOMINANCE</u>: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

a) whether Defendants' knew that the Barone/Chumenko Group were perpetrating the Nuvega scam;

b) whether Defendants' actively assisted the Barone/Chumenko Group in perpetrating the Nuvega scam, including shipping products to victims of the Nuvega Scam, accepting and processing returns and complaints from victims of the Nuvega Scam, consulting for the Barone/Chumenko Group on sales that they knew would be made to Nuvega Scam, and otherwise providing the services listed on their website in connection with Nuvega Scam;

c) whether Defendants' alleged conduct is unlawful;

d) whether the alleged conduct constitutes violations of the laws asserted;

e) whether the Defendants' wrongful conduct was intentional or knowing;

842182.2

f) whether the Defendants' wrongful conduct warrants punitive damages;

g) whether Defendants assisted in or engaged in false or misleading advertising; and

h) whether Plaintiff and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

243. <u>TYPICALITY</u>: The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

244. <u>ADEQUACY</u>: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the other Class members. Plaintiff has retained competent counsel with substantial experience in complex litigation and litigation involving scientific and technical issues, who are committed to vigorously prosecuting this action on behalf of the Class.

245. <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the

prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

246.   Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiff's claims for class-wide treatment is also appropriate because Plaintiff can

prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

247.  Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Class notice can likely be directly sent to individual members of the Class because Defendants' own records and documents will likely identify all members of the Class and contain their contact information.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violation of the Consumer Legal Remedies Act
#### Cal. Civ. Code § 1750, *et seq.*

248.  Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

249.  Plaintiff brings this claim individually and on behalf of the Class.

250.  The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

251.  The false and misleading labeling and other policies, acts, and practices by the Barone/Chumenko Group were designed to, and did, induce the purchase and use of the Nuvega Products for personal, family, or household

purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

    a. § 1770(a)(2): misrepresenting the source, sponsorship, approval, or certification of goods or services, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

    b. § 1770(a)(3): misrepresenting the affiliation, connection, or association with, or certification by, another, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

    c. § 1770(a)(5): representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, in particular through the false celebrity endorsements, the "false front" websites, the representations regarding limited supply, and the false presentation of websites as news articles described herein;

    d. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another, in particular the false celebrity endorsements as described herein;

842182.2

e. § 1770(a)(9): advertising goods with intent not to sell them as advertised, in particular in representing that they would be sold for the cost of shipping and handling as part of a free trial or for $0.00 when the Barone/Chumenko Group in fact intended to sell them as part of an ongoing subscription;

f. § 1770(a)(13): making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, in particular the false representations of a "free trial," the false representations that the products would cost $0.00, and the false representations regarding limited supply as described herein;

252. The Barone/Chumenko Group profited from their sales of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

253. The Defendants were aware of and actively assisted the Barone/Chumenko Group in their actions that violated the CLRA, and as such Defendants are jointly and severally liable for these violations. They are further directly liable for these violations based on aiding and abetting and conspiracy.

254. Plaintiff and members of the Class purchased the Products for personal use, in reliance on the false and misleading material claims as described herein.

842182.2

255.   Pursuant to Cal. Civ. Code § 1780(d), Plaintiff has attached its affidavit of venue hereto as Exhibit 2.

256.   As a result of these violations of the CLRA, Plaintiff and the Class have suffered irreparable harm and seek injunctive relief prohibiting further violations of the CLRA. Plaintiff and the Class also seek to recover their attorneys' fees and costs.

257.   Ms. Adam has standing to seek injunctive relief because she may be injured by the Defendants' conduct in the future. The Barone/Chumenko Group appear to be cycling through product names and product types, and on information and belief, are now running another "free trial" scam for a product called Red Fortera. The Barone/Chumenko Group may present other offers that result in fraudulent billing and which would be difficult to detect or identify as coming from them. The Barone/Chumenko Group further have Ms. Adam's credit card and other personal information and could attempt to bill her in the future without her consent, just as they did in the past. Defendants may further assist the Barone/Chumenko Group in the Red Fortera scam as they had in the Nuvega Scam, and they continue to ship products for the Barone/Chumenko Group as part of known scams (including a product called Canafarma).

258.   Pursuant to §1782(a) of the CLRA, Plaintiff on February 6, 2020 sent a written notice and demand via certified mail, return receipt requested, to the last

known address of SFLG Inc. On February 13, 2020, Plaintiff sent a written notice and demand via certified mail, return receipt requested, to the last known address of Defendant Kurt Ellis. Defendants have failed to respond to Plaintiff's demands. Defendants did not respond.

259.   As a direct and proximate result of the violations of the CLRA by the Defendants through their assistance of the Barone/Chumenko Group, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon the Barone/Chumenko Group's representations regarding their products. In reasonable reliance on the Barone/Chumenko Group's false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that the representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by the Barone/Chumenko Group, and therefore Plaintiff and other Class Members have suffered injury in fact. Pursuant to §1780 Plaintiff seeks actual damages, restitution of property, punitive damages, attorney's fees and costs, and any other relief that the court deems proper.

842182.2

## SECOND CAUSE OF ACTION

**Violation of the California False Advertising Law
Cal. Bus. & Prof. Code §§ 17500, *et seq.***

260.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

261.    Plaintiff brings this claim individually and on behalf of the Class.

262.    Pursuant to California Business and Professions Code § 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . [or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

263.    The Barone/Chumenko Group have violated § 17500, *et seq.*, in particular as described herein through the false celebrity endorsements, the omissions regarding their "false front" websites, their presentation of the "false front" websites to banks and credit card companies, the representations regarding limited supply, their efforts to make it difficult to cancel subscriptions, the "free trial" representations, the false representation that the products would cost $0.00, and the false presentation of websites as news articles described herein.

264.   Pursuant to California Business and Professions Code § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

265.   The Barone/Chumenko Group have violated § 17505, in particular through their representations of limited supply, the "false front" website, the false celebrity endorsements, and the false presentation of websites as news articles described herein.

266.   The Barone/Chumenko Group misled consumers by making misrepresentations and untrue statements about their products as described herein.

267.   The Barone/Chumenko Group misled consumers by omitting material information which they were under a duty to disclose as described herein. The Barone/Chumenko Group were under a duty to disclose this material information to Plaintiff and the Class Members.

268.   The Defendants were aware of and actively assisted the Barone/Chumenko Group in their actions that violated California's False Advertising Law, and as such Defendants are jointly and severally liable for these

violations. They are further directly liable for these violations based on aiding and abetting and conspiracy.

269.   The Defendants Group knew, or by the exercise of reasonable care should have known, that the representations and omissions by the Barone/Chumenko Group were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. In particular and *inter alia*, this is evidenced by the numerous negative reviews online regarding these products and others which were specifically directed at the Defendants or their companies by name, by customer complaints which, on information and belief, were communicated directly to the Defendants by victims, by the outlandishness of the conduct described and of the stories the Barone/Chumenko Group concocted regarding Blac Chyna, Oprah, Shark Tank, and others, the significant publicity these illegal free trial schemes have received, prior FTC actions and criminal prosecutions against similar enterprises, and the fact that the prevalence and illegality of these activities is well known in the affiliate marketing and direct marketing industries.

270.   As a direct and proximate result of the misleading and false advertising by the Barone/Chumenko Group, which Defendants actively assisted and enabled, Plaintiff and the other Class Members have suffered injury in fact and

have lost money or property, time, and attention. Plaintiff reasonably relied upon the misrepresentations regarding the Nuvega Products. In reasonable reliance on these false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that the representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised, and therefore Plaintiff and other Class Members have suffered injury in fact.

271.   The misrepresentations were material to the decision of Plaintiffs and the Class Members to purchase the Nuvega Products, and a reasonable person would have attached importance to the truth or falsity of the representations made by in determining whether to purchase the Nuvega Products. The suggestion that the products were endorsed by Blac Chyna was a factor in Ms. Adam's purchase and tended to lend credibility to the product, and a reasonable consumer who knew this was false would not have signed up for the "free trial." With respect to the omissions as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had the omitted information been disclosed, namely that there would be an ongoing subscription and not a one-time free sample with only a shipping and handling charge, that there was not a limited supply, and that "false front" websites

would be used to defraud their banks and credit card companies if any victims attempted a chargeback, Plaintiff and the Class Members would have been aware of it and would not have purchased the Nuvega Products or would not have paid the same price for those products.

272.    Defendants and the Barone/Chumenko Group advertised to Plaintiff and other Class Members, through written representations and omissions made by Defendants and the Barone/Chumenko Group and their employees that the Nuvega Products would be of a particular nature and quality.

273.    The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that the Barone/Chumenko Group and Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff is entitled to injunctive relief ordering Defendants to cease their actions that assist or enable false advertising, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their actions that enabled such false advertising, or such portion of those revenues as the Court may find equitable.

## THIRD CAUSE OF ACTION

### Violation of the Unfair and Fraudulent Prongs
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

274.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

275.   Plaintiff brings this claim individually and on behalf of the Class under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, et seq., against Defendants.

276.   As alleged herein, Plaintiff has suffered injury in fact and lost money or property because Ms. Adam was autobilled without her permission, was charged on her credit card without permission, and was unable to convince her bank to refund the charges. She further did not receive the benefits promised by the Nuvega Products, including a product endorsed by Blac Chyna and other celebrities. On information and belief, she further suffered injury because the Barone/Chumenko Group presented a "false front" website to Chase Bank or made other false representations to Chase Bank when they were investigating the chargebacks. Plaintiff suffered that injury at the time of purchase when Plaintiff bought products that do not deliver the promised benefits, as well as on the dates her credit card was billed without permission.

277.   The Unfair Competition Law, Business & Professions Code §17200,

*et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

278.   The Barone/Chumenko Group committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the Class; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Class Action Complaint.

279.   The Defendants were aware of and actively assisted the Barone/Chumenko Group in their actions that violated the UCL, and as such Defendants are jointly and severally liable for these violations. They are further directly liable for these violations based on aiding and abetting and conspiracy.

280.   The utility of the conduct committed by Defendants and the Barone/Chumenko Group as described herein is nonexistent. There is no utility to falsely suggesting to customers that a product has been endorsed by celebrities, to falsely suggesting a customer is signing up for a free trial, to running a "false front" website to deceive banks and others, or to any of the other conduct by the

Defendants and the Barone/Chumenko Group. The harm to consumers caused by this conduct, by contrast, is significant. The Defendants' assistance of the and the Barone/Chumenko Group's actions as described herein not only deprived the consumers of the value they were expecting to receive, it also caused them to treat themselves with ineffective products rather than alternative options, deprived them of money, and interfered with their lawful efforts to convince their banks that a fraudulent transaction had occurred.

281. Defendants' conduct as described in this Complaint offends established public policies. The Defendants' conduct violated numerous civil and criminal statutes, as described further herein and in detail in the Fourth Cause of Action. Those statutes exist for a reason: to protect consumers from unfair marketing practices, and in many cases to protect consumers' health. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are applied to the human body given the risks of such violations.

282. Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiff and the Class. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story concocted regarding Blac Chyna, Oprah, Shark Tank, and other celebrities, the significant publicity these

illegal free trial schemes have received, prior FTC actions against similar criminal enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing and direct marketing industries, and by the widespread dishonesty present in the Nuvega marketing materials.

283.  Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products are marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this complaint.

284.  As detailed herein, the unfair and/or fraudulent practices, which Defendants enabled, include the Baron/Chumenko Group's dissemination of false and/or misleading representations through their marketing and advertising.

285.  Defendants are aware that the claims or omissions that the Barone/Chumenko Group made about the Products were and continue to be false and misleading.

286.  Defendants had an improper motive—profit—in their assistance of the deceptive practices, by the Barone/Chumenko Group as set forth herein.

287.  There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

288.  As a direct and proximate result of Defendants' assistance and enabling of unfair or fraudulent business acts and practices and misleading and

false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon the representations regarding the Nuvega Products. In reasonable reliance on these false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Barone/Chumenko Group's representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised, and therefore Plaintiff and other Class Members have suffered injury in fact.

289. The representations by the Barone/Chumenko Group were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations in determining whether to purchase Nuvega Products, as described in detail herein. With respect to the omissions as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had the omitted information been disclosed, Plaintiff and the Class Members would have been aware of it and would not have purchased the products or would not have paid the same price for those products. Similarly, had Defendants not assisted the Barone/Chumenko Group in

engaging in the unfair and fraudulent business acts or practices described in this Complaint, Plaintiff and the Class Members would not have purchased the products or would not have paid the same price for those products.

290.   As purchasers and consumers of the Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

291.   The unfair and unlawful competitive practices described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code § 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FOURTH CAUSE OF ACTION

### Violation of the Unlawful Prong
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

292.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

293.   Plaintiff brings this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, individually and on behalf of the Class against the Defendants.

294.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

295.   As detailed in Plaintiff's First Cause of Action, Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

296.   As detailed in Plaintiff's Second Cause of Action, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Business & Professions Code §§ 17500, et seq.

297.   As detailed in Plaintiff's Third Cause of Action, the Defendants' acts

and practices are unlawful because they violate the prongs of California's Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibit any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...."

298.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the California Automatic Renewal Law,  Cal. Bus. & Prof. Code §§ 17600, *et seq*.

299.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the Electronic Funds Transfer Act, 15 U.S.C. § 1693e.

## Bank Fraud
## In Violation Of
## 18 U.S. Code § 1344

300.   The Defendants' conduct here is unlawful because they have conspired to commit multiple counts of bank fraud in violation of 18 U.S. Code § 1344.

301.   Pursuant to 18 U.S. Code § 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises" is in violation of the statute.

302.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

303.   The Defendants here conspired to commit bank fraud with the Barone/Chumenko Group in violation of federal law.

304.   The money obtained by the Barone/Chumenko Group through the trynuvegalashnow.com/v2/ website was obtained through credit or debit cards and was thus under the custody or control of financial institutions (in the case of Ms. Adam, Chase Bank). That money was obtained fraudulently. As described in this complaint, the Barone/Chumenko Group intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Barone/Chumenko Group intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were told that they would pay $0.00 for the Nuvega Products. The Barone/Chumenko Group

842182.2

further "churned" the merchant accounts of various shell companies to deceive banking institutions and prevent them from identifying the billings as fraudulent (which would have enabled the banks to prevent the Barone/Chumenko Group from continuing to charge their customers). The Defendants knowingly conspired with Barone/Chumenko Group to commit these violations and to benefit financially from this illegal scheme.

305.   Defendants' actions with respect to the products as described above are in violation of 18 U.S. Code § 1344 and thus constitute unlawful business acts or practices under the UCL.

**Wire Fraud
In Violation Of
18 U.S. Code § 1343**

306.   The Defendants' conduct here is unlawful because they conspired to commit multiple counts of wire fraud with the Barone/Chumenko Group in violation of 18 U.S. Code § 1343.

307.   Pursuant to 18 U.S. Code § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice" is in violation of the statute.

308.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

309.   The Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through communications to consumers which were intended to prevent them from exercising their lawful right to a chargeback. Those transmissions crossed state lines, at least from New Jersey and Maine to California and other states. The Defendants also conspired to assist the Barone/Chumenko Group in committing wire fraud by assisting its scheme in Internet ads, their websites, through e-mail, through telephone or Internet communications to banks and credit card companies asserting that their subscription billings had been agreed to by customers or that their "false front" websites were the site consumers visited.

310.   The money obtained by the Barone/Chumenko Group through the trynuvegalashnow.com/v2/ website was obtained fraudulently. As described in this complaint, the Barone/Chumenko Group intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely

upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Barone/Chumenko Group intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants knowingly conspired with the Barone/Chumenko Group to commit these violations and to benefit financially from this illegal scheme.

311.   Defendants' actions with respect to the Nuvega Products as described above are in violation of 18 U.S. Code § 1343 and thus constitute unlawful business acts or practices under the UCL.

### Mail Fraud
### In Violation Of
### 18 U.S. Code § 1341

312.   The Defendants' conduct here is unlawful because they have committed mail fraud and conspired to commit multiple counts of mail fraud in violation of 18 U.S. Code § 1341.

313.   Pursuant to 18 U.S. Code § 1341, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or

procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" is in violation of the statute.

314.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

315.   The Defendants here committed mail fraud and conspired to commit mail fraud and to receive money obtained from mail fraud in violation of federal law.

316.   The Defendants transmitted matter or things and took or received matter or things via the Postal Service or private or commercial interstate carriers

as part of their scheme to defraud, in particular by accepting return packages at the Great Lakes Fulfillment address in Maine shipped across state lines from other states (including from the state of California), and by shipping unordered products through the mail system to victims of the scheme with the intent to fraudulently bill them for those unordered products.

317.   The money obtained by the Barone/Chumenko Group through the trynuvegalashnow.com/v2/ website was obtained fraudulently. As described in this complaint, the Barone/Chumenko Group intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Barone/Chumenko Group intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants knowingly conspired with the Barone/Chumenko Group to commit these violations and to benefit financially from this illegal scheme.

318.   Defendants' actions with respect to their products as described above are in violation of 18 U.S. Code § 1341 and thus constitute unlawful business acts or practices under the UCL.

## Unlawful Violations of Federal Trade Commission Regulations Concerning Use of Endorsements and Testimonials in Advertising 16 C.F.R. pt. 255, *et seq.*

319.   The Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of endorsements and testimonials in advertising.

320.   Pursuant to 16 C.F.R. pt. 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under 16 C.F.R. pt. 255(1)(c), "[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements...."

321.   The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser." 16 C.F.R. pt. 255(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* at 255(c).

322.  Endorsers include consumers who receive free products from advertisers through their marketing programs. 16 C.F.R. pt. 255, Example 8. Endorsers also include third party bloggers who are compensated in any way by

advertisers, and advertisers are subject to liability for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. pt. 255.1, Example 5.

323.   Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers:  "In order to limit its potential liability, the advertiser should ensure that the advertising service provides guidance and training to its bloggers concerning the need to ensure that statements they make are truthful and substantiated. The advertiser should also monitor bloggers who are being paid to promote its products and take steps necessary to halt the continued publication of deceptive representations when they are discovered." 16 C.F.R. pt. 255.1, Example 5.

324.   Plaintiff incorporates by reference the Factual Allegations section of this   Complaint,   including   that   the   Defendants   conspired   with   the Barone/Chumenko Group to assist in the Nuvega Scam.

325.   As that section describes, the Barone/Chumenko Group faked various endorsements from celebrities and other third parties who in fact have no connection to the product, have not used it, and did not make the statements and endorsements the Barone/Chumenko Group attributed to them.

326.   Under   16   C.F.R.   pt.   255.2(c),   "[a]dvertisements   presenting endorsements by what are represented, directly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

327.   The Barone/Chumenko Group falsely presented endorsements from celebrities as if those celebrities were actual consumers, including photographs of those purported celebrity consumers.

328.   Members of the Class were injured by this unlawful conduct and the violations of these regulations, in that Ms. Adam and the other class members would not have purchased the products but for the fake endorsements from celebrities which made the product seem credible.

329.   Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the
Sherman Food, Drug, & Cosmetic Law
Cal. Health & Safety Code, §§ 109875, *et seq.***

330.   The Defendants' acts and practices are unlawful under the California UCL because they violate the Sherman Food, Drug, & Cosmetic Law.

331.    The Nuvega Products constitute cosmetics under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109900, a "cosmetic" is "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." The Nuvega Products are cosmetics under this definition because they are applied to the human body in some form, and the products product sold by them are designed to beautify, promote the attractiveness of, or alter the appearance of skin.

332.    The Nuvega Products also constitute drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109925, a "drug" includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal" and "[a]n article other than food, that is used or intended to affect the structure or any function of the body of human beings or any other animal." The Nuvega Products are drugs under this definition because they are not food and because they are intended to affect the structure or function of the eyelash and its hair cells, and claim to affect such structure or function.

333.    The Nuvega Products also constitute new drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109980, a

"new drug" includes "[a]ny drug the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof," or one that "has become so recognized, but that has not, otherwise than in the investigations, been used to a material extent or for a material time under the conditions." The Nuvega Products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. Their products use a blend of various ingredients, and it is that blend—the "composition"—which is at issue.

334.   The representations about the Nuvega Products as described in this Complaint constitute advertisements under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109885, an "advertisement" means "any representations, including, but not limited to, statements upon the products, its packages, cartons, and any other container, disseminated in any manner or by any means, for the purpose of inducing, or that is likely to induce, directly or indirectly, the purchase or use of any food, drug, device, or cosmetic." The representations as described herein were likely to induce, directly or indirectly, the purchase of the Nuvega Products, which constitute drugs and cosmetics, and they did in fact induce such purchases as described in this Complaint. The

representations were disseminated to the Plaintiffs and the Class using various means, including advertisements on Snapchat and on the Defendants' websites.

335.    Pursuant to Cal. Health & Safety Code § 110390, "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."

336.    Pursuant to Cal. Health & Safety Code § 110395, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised."

337.    The Defendants and the Barone/Chumenko Group violated Cal. Health & Safety Code § 110390 and § 110395 by disseminating false and misleading advertisements, as described in detail throughout this Complaint, and by selling, delivering, and offering for sale their products which were falsely advertised.

338.    As stated above, Nuvega Products are new drugs under the Sherman Food, Drug, & Cosmetic Law. *See* Cal. Health & Safety Code § 109980. New drugs are subject to specific approval requirements, and "[n]o person shall sell, deliver, or give away any new drug" unless the statutory requirements are satisfied. Cal. Health & Safety Code § 111550. One way to satisfy the requirements is that the product is a "new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section

505 of the federal act (21 U.S.C. Sec. 355)." Cal. Health & Safety Code § 111550(a)(1). Another is that "[t]he department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended." Cal. Health & Safety Code § 111550(b). The remaining methods are inapplicable to the Nuvega Products, and on information and belief, Defendants and the Barone/Chumenko Group have failed to satisfy the approval requirements for a new drug under the Sherman Food, Drug, & Cosmetic Law.

339.  In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

340.  Defendants' actions with respect to its products as described above are in violation of Cal. Health & Safety Code, §§ 109875, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**
**Federal Food, Drug, and Cosmetic Act**
**21 U.S.C. § 301,** *et seq.*

341.   The Defendants' acts and practices are unlawful under the California UCL because they violate the Federal Food, Drug, and Cosmetic Act.

342.   The Nuvega Products constitute drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(g)(1), a "drug" includes "(C) articles (other than food) intended to affect the structure or any function of the body of man or other animals...."

343.   The Nuvega Products are advertised as affecting the structure or function of the human body, and are intended to affect the structure or function of the human body. The Barone/Chumenko Group advertise that their products are an "eyelash enhancement serum." They claim that it results in "[e]yelashes from 30 to 50% longer, thicker, and darker in 6 – 8 weeks." They also advertise that Nuvega Lash alters the functionality of the human eyelash as well as its hair cells: "NUVEGALash not only extends the growth cycle of lashes, but also nourishes and stimulates the hair cells." They state in the FAQ on trynuvegalashnow.com that Nuvega Lash can "help strengthen the root of the lash."[107] The FAQ further states that: "NUVEGALash's unique formula has been designed to help enhance your natural eyelashes and brows, not only by making them more flexible and

---

[107] FAQ, https://trynuvegalashnow.com/faq.php (last visited Jan. 12, 2020).

stronger, but by also nourishing them."[108]

344.   The Nuvega Products constitute new drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(p)(1), a "new drug" includes "[a]ny drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use...."

345.   The Nuvega Products products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. Their products use a blend of various ingredients, and it is that blend—the "composition"—which is at issue. Even the effectiveness of the individual ingredients in the Nuvega Products is not generally recognized, but the composition itself is not even generally known to exist among experts in this field, let alone generally recognized as effective.

---

[108] *Id.*

346.   Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."

347.   On information and belief, neither the Defendants nor the Barone/Chumenko Group have filed a new drug application or obtained approval of any of their products from the Food and Drug Administration. As such, it was unlawful for them to introduce or deliver their products into interstate commerce, and **all** sales or deliveries of their products in the United States were unlawful.

348.   In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

349.   Defendants' actions with respect to the Nuvega Products as described above are in violation of 21 U.S.C. § 301, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of the
### Federal Trade Commission Act
### 15 U.S.C. § 41, *et seq.*

350.    Pursuant to 15 U.S.C. § 45(a)(1), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

351.    Pursuant to 15 U.S.C. § 52(a), "[i]t shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."

352.    The Nuvega Products are both drugs and cosmetics.

353.    As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants engaged in unfair methods of competition in or affecting commerce, as well as unfair or deceptive acts or practices in or affecting commerce. The act of selling their products online satisfies the requirement of "in or affecting commerce."

354.    As described throughout this Complaint and in the First, Second, and

Third Causes of Action, Defendants assisted in the dissemination of false advertisements online and sales of the Nuvega Products online, which satisfies the requirement of "in or affecting commerce." Those advertisements were intended to induce and did in fact induce the purchase of the Nuvega Products.

355.   Defendants' actions with respect to its products as described above are in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Trade Commission Regulations Concerning Use of the Word "Free" and Other Similar Representations 16 C.F.R. pt. 251, *et seq.*

356.   Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of the word "free" and other similar representations in advertising.

357.   Pursuant to 16 C.F.R. pt. 251.1(a)(2), "[b]ecause the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived."

358.   "[A] purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be

purchased, by the substitution of inferior merchandise or service, or otherwise." 16 C.F.R. pt. 251.1(b).

359.   Because of this right, Federal regulations strictly limit the duration of any 'free' offers in any given trade area: "So that a 'Free' offer will be special and meaningful, a single size of a product or a single kind of service should not be advertised with a 'Free' offer in a trade area for more than 6 months in any 12-month period. At least 30 days should elapse before another such offer is promoted in the same trade area. No more than three such offers should be made in the same area in any 12-month period. In such period, the offeror's sale in that area of the product in the size promoted with a 'Free' offer should not exceed 50 percent of the total volume of his sales of the product, in the same size, in the area."

360.   On information and belief, the Barone/Chumenko Group advertised their false "free trial" or $0.00 price for more than six months (from late 2016 through at least January 2020), and 100% of the sales were promoted with a "free" offer.

361.   On information and belief, the Defendants were aware of these false advertisements as they handled the returns of the Nuvega Products.

362.   Offers labeled as "free" must comply with strict Federal disclosure regulations: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent

should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset." 16 C.F.R. pt. 251.1(c).

363. The Barone/Chumenko Group failed to comply with these requirements to clearly and conspicuously disclose all terms, conditions, and obligations at the outset because on the trynuvegalashnow.com/v2/ website, the terms were not disclosed, false representations that the products would cost $0.00 were made, and any disclosure of a subscription was buried on another web page in a lengthy terms of service.

364. Defendants' assistance to the Barone/Chumenko Group with respect to its use of the word "free" as described above are in violation of 16 C.F.R. pt. 251, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Law Governing Negative Option Marketing On The Internet 15 U.S.C. § 8403, *et seq.*

365. Pursuant to 16 C.F.R. § 310.2, "[n]egative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under

which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

366.   The Barone/Chumenko Group utilize negative option features on their websites, offers, and agreements to sell their products because they purport to sign consumers up for a "free trial," and then interpret that as acceptance of a paid subscription if the consumer does not cancel shortly thereafter.

367.   Pursuant to 15 U.S.C. § 8403, "[i]t shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and (3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."

368.   Defendants and the Barone/Chumenko Group together in concert failed to follow any of these requirements, and in fact they affirmatively acted to make it as difficult as possible to cancel the subscription, as described herein.

369.   Defendants' actions with respect to the Nuvega Products as described above are in violation of Federal law governing negative option marketing on the Internet, 15 U.S.C. § 8403, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

### Injury from Defendants' Unlawful Actions

370.   To extend that the unlawful conduct described above was based on misrepresentations, deception, or omission, Defendants knew, or by the exercise of reasonable care should have known, that their actions assisted the Barone/Chumenko Group's representations, that those representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members.

371.   As a direct and proximate result of Defendants' unlawful conduct and unfair competition, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon the representations regarding the Nuvega Products. In reasonable reliance on the false representations, and as a result of Defendants' unlawful

conduct and unfair competition, Plaintiff and other Class Members purchased the Nuvega Products and paid more for those products than they would have had they been aware that the representations were false or had the Defendants not engaged in the unlawful and unfair conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

372.    As purchasers and consumers of the Nuvega Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

373.    The unfair and unlawful competitive practices described herein present a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code § 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues

842182.2

associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FIFTH CAUSE OF ACTION

### Violation of the California Automatic Renewal Law
### Cal. Bus. & Prof. Code §§ 17600, *et seq.*

374. Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

375. Plaintiff brings this claim individually and on behalf of the Class.

376. Pursuant to California Business and Professions Code section 17600, *et seq.*, "[i]t is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."

377. California Business and Professions Code section 17602 prohibits "any business that makes an automatic renewal or continuous service offer to a consumer in this state" from engaging in certain activities.

378. Pursuant to California Business and Professions Code section 17602(a)(1), it is unlawful for such a business to "[f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity... to the request for consent to the offer."

379. Pursuant to California Business and Professions Code section 17602(a)(1), if an automatic renewal offer "also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial."

380. Pursuant to California Business and Professions Code section 17601(c), "'Clear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."

381. Pursuant to California Business and Professions Code section 17602(a)(2), it is unlawful for a business to "[c]harge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time."

382.   Pursuant to California Business and Professions Code section 17602(b), "[a] business that makes an automatic renewal offer or continuous service offer shall provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a)."

383.   Pursuant to California Business and Professions Code section 17602(c), "a consumer who accepts an automatic renewal or continuous service offer online shall be allowed to terminate the automatic renewal or continuous service exclusively online, which may include a termination email formatted and provided by the business that a consumer can send to the business without additional information."

384.   The Barone/Chumenko Group violated the provisions of this statute, as described herein. They failed to inform consumers in a conspicuous manner or in visual proximity to the request for consent to the offer that they were signing up for an automatic renewal subscription. The Barone/Chumenko Group together with the Defendants further violated the statute by making cancellation of the subscriptions as difficult as possible, including by using tactics such as placing customers on hold for lengthy periods of time or otherwise being difficult with them on telephone calls, by failing to provide an easy method of cancellation, and

by using their "false front" website to deceive customers and their banks into thinking there had been an agreement to a terms of service the victims never agreed to. Defendants knowingly assisted with these violations and are further directly liable for these violations based on aiding and abetting and conspiracy.

385.   Plaintiff and the Class were injured by these violations because their bank accounts or credit cards were automatically billed without their permission and in violation of the statute. As a result, they lost money and were charged for products they never agreed to purchase.

386.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing and an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute.

## SIXTH CAUSE OF ACTION

### Violation of 15 U.S.C. § 1693e
### of the Electronic Fund Transfer Act

387.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

388.   Plaintiff brings this claim on behalf of the Class.

389.   15 U.S.C. § 1693e(a) provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in

842182.2

writing, and a copy of such authorization shall be provided to the consumer when made."

390.    15 U.S.C. § 1693a(10) provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

391.    Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

392.    Section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Official Staff Commentary to Regulation E further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), cmt. 6, Supp. I.

393.    On information and belief, the Barone/Chumenko Group debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated writing from consumers for preauthorized electronic fund transfers from their accounts, thereby violating

Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

394.  Further, on information and belief, the Barone/Chumenko Group debited consumers' bank accounts on a recurring basis without providing a copy of written authorization signed or similarly authenticated writing by the consumer for preauthorized electronic fund transfers from the consumer's account, or without providing clear and readily understandable terms of the preauthorized transfer, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

395.  As set forth herein the Defendants actively assisted the Barone/Chumenko Group in its scheme, which included the recurring charges. They are further directly liable for these violations based on aiding and abetting and conspiracy.

396.  Pursuant to 15 U.S.C. §1693m(a), Defendants are civilly liable to all injured victims of the class for these violations.

397.  Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing, an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute, costs, reasonable attorney's fees, and statutory penalties.

842182.2

## SEVENTH CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961, *et seq.* (All Defendants)

398.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

399.   Plaintiff brings this claim individually and on behalf of the Class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, on behalf of themselves and the Class against all Defendants.

400.   18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

401.   18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

402.   Defendants have committed violations of these sections, as described in further detail below.

842182.2

403.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

404.   The Nuvega scam constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." As described herein, all of the Defendants are individuals and legal entities who associated in fact to comprise and operate the Nuvega scam (the "Nuvega Enterprise"). The Nuvega Enterprise consist of each entity within the Barone/Chumenko Group (Frank V. Barone; Kirill Chumenko; Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; Advanced Beauty LLC) and Defendants Kurt Ellis; and SFLG Inc.

405.   Defendants and the Barone/Chumenko Group agreed to - and did - operate the Nuvega Enterprise through a pattern of racketeering activity. Defendants conducted the Nuvega Enterprise's affairs through illegal acts, specifically, multiple related acts of mail fraud, wire fraud, and bank fraud, as described in the Fourth Cause of Action herein.

406.   Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Each of these entities is a corporation, and collectively they are associated in fact as described herein ("The Fortera Enterprise").

407.   SFLG Inc. constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because it is a corporation. It was operated by Defendant Kurt Ellis as an enterprise in violation of RICO. Defendant Ellis conducted the affairs of this corporation through illegal acts, namely the mail fraud, wire fraud, and bank fraud described herein.

408.   Frank V. Barone and Kirill Chumenko operated the Fortera Enterprise (Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC) as an enterprise and operated these corporate entities in violation of RICO. They

conducted the affairs of these corporations through illegal acts, namely the mail fraud, wire fraud, and bank fraud described herein.

409.    Frank V. Barone and Kirill Chumenko agreed to facilitate the operation of an enterprise through a pattern of racketeering activity, and they did so knowingly and intentionally. The fraudulent representations and omissions are so outlandish and so prevalent in the Nuvega Products' advertising, and are highlighted in so many customer complaints, that it would have been impossible for either Frank V. Barone or Kirill Chumenko not to have been aware of them and to have agreed to them. Moreover, the bank fraud committed by Barone and Chumenko occurred using shell companies who were listed as operating from their home addresses, and on information and belief did so at their direction and with their knowledge.

410.    Frank V. Barone and Kirill Chumenko conspired to commit and agreed to the commission of at least two predicate acts.

411.    18 U.S.C. § 1961(1) defines racketeering activity to include "any act which is indictable under any of the following provisions of title 18, United States Code... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud)...."

412.   Frank V. Barone and Kirill Chumenko have committed both wire and mail fraud, as well as bank fraud, as explained further herein in the Fourth Cause of Action. These predicate acts occurred from roughly late 2016 through the present, and were reflected in the websites run by the Barone/Chumenko Group, the trynuvegalashnow.com/v2/ landing page which on information and belief has been live since late 2016, the fake celebrity news articles as described herein whose dates are unknown, and the "false front" websites as described herein.

413. Barone and Chumenko first registered trynuvegalashnow.com on November 3, 2016 through Tracey Meyer, an employee of Fortera Nutra Solutions LLC, which is the earliest currently known predicate act. This is consistent with the negative customer reviews reporting fraud, which began as early as January 4, 2017, in a Better Business Review for Green Pogo LLC which reported having signed up for a Nuvega Lash trial more than a month earlier (placing the date the scam began in roughly December 2016).

414.   The "false front" websites, which on information and belief were used to defraud banks, were first registered as follows: lashesbynuvega.com (July 21, 2017); www.nuveganlashes.com (March 10, 2017); www.nuvegavegan.com (November 21, 2017); www.nuveganbrows.com (March 10, 2017); www.shopnuvega.com (October 13, 2017); www.browbynuvega.com (August 28, 2017); www.bestveganlash.com (August 28, 2017); www.bestveganbrow.com

(August 28, 2017); and www.nuvegalashforvegans.com (August 19, 2016). On information and belief, these dates roughly comport to when Barone and Chumenko first began using these "false fronts" to commit wire fraud and bank fraud, as described further in Plaintiff's Fourth Cause of Action.

415.   These acts of wire and mail fraud were committed willfully and intentionally as described further herein, and were made in furtherance of the scheme and common course of conduct in that they were designed to defraud customers of the Nuvega Products of money and property.

416.   These acts constitute a pattern of racketeering activity, defined in 18 U.S.C. § 1961(1) as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." There are countless acts individual acts of wire and mail fraud identified here which occurred from at least December 2016 to the present, including a minimum of 2,000 victims who were defrauded based on the invoices provided by Affiliati and described further herein. These acts were related to one another in that all had a common purpose to defraud potential customers of the Nuvega Products, that the victims were directed to the trynuvegalashnow.com/v2/ landing page, that the participants were the same, and that the methods were the same or similar. These acts occurred over a period of

more than two years, and they are currently ongoing in that on information and belief, many individuals are still being billed and shipped products on a monthly basis for products they purchased based on past acts of fraud, the deceptive websites are still operative, and many of the misrepresentations are actively being made to new customers. On information and belief, additional predicate acts may have occurred far earlier and may be uncovered in discovery, particularly through Barone and Chumenko's sale of earlier products and their current sales of the Red Fortera product and products related to it.

417. On information and belief, and based on the evidence described further herein, Defendant Kurt Ellis was aware of these predicate acts and conspired to commit and agreed to the commission of at least two predicate acts. Defendant Kurt Ellis further caused Defendant SFLG Inc. to directly commit mail fraud by shipping the Nuvega Products to victims through the Postal Service, despite knowing that those shipments were being made in support of a fraudulent scheme. As described further herein, Defendant Kurt Ellis caused Defendant SFLG Inc. to consult on a routine basis for companies running fraudulent "free trial scams," and caused the company to provide a menu of services enabling that fraud which was used to further the predicate acts committed by Barone and Chumenko. Defendant Kurt Ellis conspired with (and caused SFLG Inc. to conspire with) the all entities within the Barone/Chumenko Group to commit the acts of wire fraud,

mail fraud, and bank fraud described herein. On information and belief, these activities also occurred from December 2016 through the present as to the Nuvega Products, and Mr. Ellis has been operating SFLG Inc. in this fashion since 2002 when it was incorporated.

418.    The Defendants and the Barone/Chumenko Group comprising the Nuvega Enterprise worked together as an association in fact to commit, and conspired to commit, the acts of wire fraud, mail fraud, and bank fraud described herein. Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC sold the products, fraudulently obtained merchant accounts in order to prevent the scheme from being discovered and to allow the enterprise to continue to bill despite high chargeback rates, defrauded financial institutions by lying about the websites on which victims signed up for the "free trials," and arranged for fraudulent advertising to be performed by John Doe affiliates and affiliate networks. These companies used their separate legal incorporation to facilitate the enterprise by posing to financial institutions as if they were the entity selling Nuvega Lash, and by separating out the chargeback rates among nominally separate legal entities to prevent the fraud from being detected. On information and belief, despite their nominal legal separation, employees of Fortera Nutra Solutions

LLC were involved in the process of managing interaction with the victims of Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC. Defendant SFLG Inc. worked as part of the Nuvega Enterprise to provide the services described herein. Defendants Ellis, along with Barone, and Chumenko managed the Nuvega Enterprise as described herein. The Defendants and the other named entities and individuals committed at least two predicate acts given the volume of the customers at issue.

419.   The predicate acts by the Defendants affected interstate commerce, in that the shipments crossed state lines and the advertisements were transmitted via wire across the country, resulting in purchases of the Nuvega Products through interstate commerce which were sent via United States mail.

420.   The RICO violations alleged here have caused harm to a specific business or property interest. In particular, as a result of the misrepresentations and omissions described herein, Plaintiff reasonably relied upon misrepresentations regarding the Nuvega Products made by the Nuvega Enterprise. In reasonable reliance on these false representations, and as a result of the RICO violations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that representations by the Nuvega Enterprise were false or had the Defendants not engaged in the

unlawful conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by the Nuvega Enterprise, and therefore Plaintiff and other Class Members have suffered specific harm to a property interest, the money they paid to by the Nuvega Enterprise. Plaintiff's banks were further harmed through the "false front" websites and the churning of merchant accounts.

421.    The RICO violations here have caused concrete financial loss. In particular, as described above, money was paid by Plaintiff and members of the Class to the by the Nuvega Enterprise in reliance on their misrepresentations and omissions. Plaintiff and the Class Members were overcharged for those products relative to their actual value, and the value was substantially inflated by the various misrepresentations and omissions as described further herein.

422.    The RICO violations were both the but-for cause and the proximate cause of these injuries. But for the violations, as described herein, Plaintiff and the Class Members would not have purchased the products or would not have paid an inflated price for them. But for the bank fraud, the scheme would have been shut down or the Plaintiff and the Class Members would have been able to successfully execute chargebacks. The violations were the proximate cause of these injuries because the violations led directly to the injuries—the fraudulent representations

and omissions were designed to induce customers to purchase the Nuvega Products, and it was because of these representations and omissions that the customers made their purchases.

423.   Because of these violations and pursuant to 18 U.S.C. § 1964(c) and 1964(d), Defendants are liable to Plaintiff and the Class Members for three times the damages Plaintiff and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION

### Violation of Various Consumer Protection Laws
### On Behalf of Nationwide Class

424.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

425.  Plaintiff brings this claim for deceptive acts and practices in violation of various states' consumer protection statutes against the Defendants on behalf of the Nationwide Class.

426.  The Defendants have engaged in deceptive acts and unfair practices that have caused actual damages to Plaintiff and the Nationwide Class, as described herein, including the misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, and sale of the Nuvega Products and to the assistance provided to the Barone/Chumenko Group and their advertising, promotion, packaging, and sale of the Nuvega Products.

427.  The Defendants' deceptive and unfair trade practices have been carried out in the course of conducting the Defendants' business, trade, and commerce.

428.  The Defendants' acts—including their intentional efforts to assist the Barone/Chumenko Group in misleading consumers regarding the benefits and effectiveness of the Nuvega Products—are willful, unfair, unconscionable, deceptive, contrary to public policy and injurious to consumers.

429.  Any objectively reasonable consumer acting reasonably in the circumstances would have been deceived by the acts and practices of the Barone/Chumenko Group, which the Defendants actively aided and abetted.

430.  The Defendants' acts are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, are accompanied by a wanton and willful disregard for consumers' well-being, and are motivated solely by the desire for financial gain.

431.  As a direct and proximate result of the Defendants' deceptive practices, Plaintiff and the Nationwide Class have sustained actual damages.

432.  Plaintiff and the Nationwide Class demand damages, attorneys' fees and costs, and any other relief to which they may be entitled.

433.  Plaintiff's claims are representative of similar claims available to non-California Nationwide Class members under the laws of other states, which also are amenable to further subclass treatment. Such laws may include, but are not

limited to: Ala. Code § 8-19-1 *et seq.*; Alaska Stat. § 45.50.471 *et seq.*; Ariz. Rev. Stat. Ann. § 44-1521 *et seq.*; Ark. Code Ann. § 4-88-101 *et seq.*; Cal. Civil Code § 1750 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq.* & 17500 *et seq.*; Colo. Rev. Stat. § 6-1-101 *et seq.*; Conn. Gen. Stat. § 42-110a *et seq.*; Del. Code Ann. tit. 6 § 2511 *et seq.* & 2580 *et seq.*; D.C. Code Ann. § 28-3901 *et seq.*; Fla. Stat. § 501.201 *et seq.*; Ga. Code Ann. § 10-1-390 *et seq.*; Haw. Rev. Stat. § 480-1 *et seq.*; Idaho Code Ann. § 48-601 *et seq.*; 815 Ill. Comp. Stat. 505/1 *et seq.*; Ind. Code Ann. § 24-5-0.5-1 *et seq.*; Iowa Code § 714.16 *et seq.*; Kan. Stat. Ann. § 50-623 *et seq.*; Ky. Rev. Stat. Ann. § 367.110 *et seq.*; La. Rev. Stat. Ann. § 51:1401 *et seq.*; Me. Rev. Stat. Ann tit. 5, § 205-A *et seq.*; Md. Code Ann., Com. Law § 13-101 *et seq.*; Mass. Gen. Laws ch. 93A, § 1 *et seq.*; Mich. Comp. Laws § 445.901 *et seq.*; Minn. Stat. § 831 and § 325F.67 *et seq.*; Miss. Code Ann. § 75-24-1 *et seq.*; Mo. Ann. Stat. § 407.010 *et seq.*; Mont. Code Ann. § 30-14-101 *et seq.*; Neb. Rev. Stat. Ann. § 59-1601 *et seq.*; Nev. Rev. Stat. Ann. § 598.0903 *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*; N.J. Stat. Ann. § 56:8-1 *et seq.*; N.M. Stat. § 57-12-1 *et seq.*; N.Y. Gen. Bus. Law § 349 *et seq.* and § 350 *et seq.*; N.C. Gen. Stat. § 75-1.1 *et seq.*; N.D. Cent. Code § 51-12-01 *et seq.* and § 51-15-01 *et seq.*; Ohio Rev. Code Ann. § 1345.01 *et seq.*; Okla. Stat. tit. 15, § 751 *et seq.*; Or. Rev. Stat. § 646.605 *et seq.*; 73 Pa. Stat. Ann. §§ 201-1 *et seq.*; R.I. Gen. Laws §§ 6-13.1-1 *et seq.*; S.C. Code Ann. § 39-5-10 *et seq.*; S.D. Codified Laws § 37-24-1 *et seq.*; Tenn. Code

Ann. § 47-18-1091 *et seq.*; Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*; Utah Code Ann. § 13-11-1 *et seq.*; Vt. Stat. Ann. tit. 9, § 2451 *et seq.*; Va. Code Ann. §§ 59.1-196 *et seq.*; Wash Rev. Code § 19.86.010 *et seq.*; W. Va. Code § 46A-6-101 *et seq.*; Wis. Stat. § 100.18 *et seq.*; and Wyo. Stat. Ann. §§ 40-12-101 *et seq.*

## NINTH CAUSE OF ACTION

### Aiding and Abetting

434.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

435.   On information and belief, Defendants knew that the tortious conduct alleged in this complaint was occurring and that it constituted a breach of duties to Plaintiffs. Defendants had actual knowledge of the wrongful conduct described herein. It is widely known among these scammers and among the various companies that provide them aid and assistance (the fulfillment companies and payment processing companies) that the Federal Trade Commission has branded these schemes illegal and is aggressively pursuing them.

436.   Defendants gave substantial assistance or encouragement to the other Defendants as described further herein.

437. Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

438.   Defendants are thus jointly and severally liable for the conduct alleged herein by all of the entities within the Barone/Chumenko Group.

## TENTH CAUSE OF ACTION

### Civil Conspiracy

439.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

440.   The Defendants and the Barone/Chumenko Group ("the Conspirators") formed a conspiracy to commit the tortious and unlawful conduct described herein.

441.   On information and belief, there was an agreement among the Conspirators to commit those wrongful acts and to cooperate in furtherance of the commission of those wrongful acts. This agreement is implied by the conduct of the conspirators because of the common knowledge among these scammers that their conduct is illegal, because of their contracts with one another, because the fulfillment companies and "crooked processors" target this kind of scammer specifically to be their customers, and because of the nature of their close interaction as an economic unit.

442.   The Defendants and the Barone/Chumenko Group were aware of the conduct of each other, and specifically of its unlawful nature. The Defendants agreed with one another and with the Barone/Chumenko Group that this conduct

842182.2

would be committed and intended that it be committed. It was in the Defendants' interests that this conduct be committed because they were specifically financially compensated for their participation. The Defendants acted in furtherance of their own financial gain as evidenced by this compensation.

443.    Plaintiff and the Class were harmed by the wrongful conducted committed by the Conspirators as part of the conspiracy, as described throughout this Complaint in the Causes of Action underlying the Conspiracy claim. As a direct and proximate result of the Conspirators' wrongful conduct, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. In reasonable reliance on the Conspirators' misrepresentations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they otherwise would have. In turn, Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised, and therefore Plaintiff and other Class Members have suffered injury in fact. These representations were material to the decision of Plaintiffs and the Class Members to purchase the Nuvega Products, and a reasonable person would have attached importance to the truth or falsity of the representations. Defendant's actions in assisting the Barone/Chumenko Group in perpetuating the Nuvega Scam were a

necessary, but-for cause in assisting the Barone/Chumenko Group to cause the Plaintiff to purchase the Nuvega Products based on the misrepresentations.

444.   Each of the Defendants listed in this Cause of Action is thus jointly and severally liable for the conduct committed by the conspiracy.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment as follows:

A.     An order declaring that this action may be maintained as a class action pursuant to Fed. R. Civ. Proc. 23, certifying this case as a class action, appointing Plaintiff as representative of the Class, and designating their attorneys as Class Counsel;

B.     Declaratory judgment that Defendant's actions are unfair and unlawful;

C.     An award of injunctive relief as permitted by law or equity including an order prohibiting Defendant from engaging in the unlawful and tortious acts described above, as well as prohibiting Defendants from charging any further subscription payments to members of the Class without first informing them of the misrepresentations and omissions, correcting them, and gaining affirmative consent to continue those subscriptions;

D.     A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

E.     For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendant's practices, along with punitive damages;

F.     For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of its unlawful, unfair, and deceptive business practices described herein;

G.     For damages of three times the damages Plaintiff and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and (d);

H.     An award of attorney's fees and costs;

I.     For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

J.     Such other and further relief as is necessary and appropriate.

# DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all

issues so triable.

**LITE DEPALMA GREENBERG, LLC**

Dated: September 18, 2020     */s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: bgreenberg@litedepalma.com

**KNEUPPER & COVEY, PC**
Kevin Kneupper
*(pro hac vice application forthcoming)*
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
Telephone: (657) 845-3100
E-mail: kevin@kneuppercovey.com

*Attorneys for Plaintiff Cindy Adam and the putative
Class*

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil action:

- *Adam v. Barone et al.*, 3:20cv10321., (D.N.J.) (MAS)(LHG)

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**LITE DEPALMA GREENBERG, LLC**

Dated: September 18, 2020    */s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone: (973) 623-3000
E-mail:  bgreenberg@litedepalma.com

**KNEUPPER & COVEY, PC**
Kevin Kneupper
*(pro hac vice application forthcoming)*
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
Telephone: (657) 845-3100
E-mail:  kevin@kneuppercovey.com

*Attorneys for Plaintiff Cindy Adam and the putative Class*

# EXHIBIT 1



# Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements

**BBB International Investigations Initiative**

**BBB Chicago** *bbbinfo@chicago.bbb.org*
**BBB Dallas** *info@nctx.bbb.org*
**BBB Omaha** *info@bbbinc.org*
**BBB San Francisco** *info@bbbemail.org*
**BBB St. Louis** *bbb@stlouisbbb.org*

**C. Steven Baker** *stbaker@bbbinc.org*

*Issued December 2018*



# Better Business Bureau®

## Introduction

You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these "miracle" products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites.

You may be enticed to try these products through a "risk-free" trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited.

Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund.

The study found that many of the celebrity endorsements are fake. Dozens of celebrity names are used by these frauds without their knowledge or permission, ranging from Oprah Winfrey, Chrissy Teigen and Ellen Degeneres to Mike Rowe, Tim Allen and Sally Field. Sometimes the fine print even admits these endorsements are not real.

BBB receives complaints from free trial offer victims nearly every day and warns consumers to use extreme caution before agreeing to the offer and entering their credit card information. The chance of encountering this type of deception is high; they have infested the internet and social media. Solving this issue will require widespread education, law enforcement and work by credit card companies to recognize these types of fraudulent activities and deter access to the credit card system.





Losses in cases of this type pursued by the Federal Trade Commission (FTC) over the last ten years total more than $1.3 billion. Fraudsters have created a global multi-billion dollar industry.

Free trial offers can be legitimate ways to introduce new products. Credible companies make sure consumers understand what they are signing up for and do not hide key information.

Megan Olsen at the Council for Responsible Nutrition, the trade association for the major dietary supplement companies, says, "No legitimate company selling dietary supplements would engage in bogus free trial offers, trick people into subscriptions for continuing shipments, make outrageous unsupportable claims for products, or employ the names of celebrities without permission. In fact, we work with BBB to identify bogus product claims and encourage law enforcement action against deceptive practices."

The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors. But locating these operations can be elusive and identifying those behind them challenging.

This study shows the scope of the problem, describes the components that make fraudulent operations successful, discusses efforts to combat this deception and offers recommendations.

# Better Business Bureau®

## Scope of the problem

### How large is the fake free trial offer industry?

The problem is growing. **Available data from the FTC shows that complaints about "free trials" more than doubled between 2015 to 2017,** though not all people who complain actually lose money. Victims in 14 resolved FTC cases lost $1.3 billion. There may have have been more than a million victims just in those cases.

**BBB has identified 36,986 complaints and Scam Tracker Reports over the last three years**, though not all involve monetary loss. **Consumers reporting to BBB lost an average of $186.**

In addition, the FBI's Internet Crime Complaint Center *(IC3)* has seen an increase in complaints about free trial offers.

| IC3 | | |
|------|-------------|-------------|
| Year | Complaints | Losses |
| 2015 | 1738 | $5,709,227 |
| 2016 | 1927 | $3,884,439 |
| 2017 | 2486 | $5,669,170 |
| **Total** | **6151** | **$15,262,836** |

The **Canadian Anti-Fraud Centre** *(CAFC)* examined free trials and subscription traps in April of 2017. They only received 54 complaints from 2011 to 2016, but from March 2016 to March 2017 they received 518 complaints, an 859 percent increase. Of the 518 complainants, 474 lost money, with a total loss of $192,419 Canadian dollars *(approximately $146,812 U.S. dollars)* and an average loss of CA$248.

The CAFC also identified 371 company names engaged in free trial offers. The most common "gifts" or products ordered by victims were facial and wrinkle creams.

This is undoubtedly a worldwide problem. UK law enforcement says they get complaints but "don't have reliable numbers."

The Australian Competition and Consumer Commission *(ACCC)* has noticed a sharp increase in complaints about free trial offers and issued a **warning** about this type of fraud in September 2018. The ACCC says: "reports to Scamwatch increase[ed] 400 percent and losses increasing a staggering 3,800 per cent so far in 2018." The ACCC also warned that these regularly include supposed endorsements from celebrities.

These numbers most likely are low for several reasons. First, FTC studies have found that less than 10 percent of fraud victims report their losses to BBB or law enforcement. Second, many of these products are sold internationally, and victims in other countries are unlikely to file complaints in the U.S. or Canada. Complaint numbers are difficult to obtain because law enforcement does not yet categorize these types of complaints separately.



### Who are the victims of free trial offer frauds?

An examination of complaints and reports to BBB found that 72 percent were females and 28 percent are male. This may be because so many of these products are skin creams geared to that demographic. Other products may be directed to a male audience and some, such as diet pills, may affect a general audience. In addition, victims appear to span all income and education levels.

**Ages of victims:** The Internet Crime Complaint Center complaints are spread fairly evenly over age ranges, with a slight increase in ages 30-39.

| From 2015 - 2017 | | | | | | |
|---------|-------|-------|-------|-------|------|-----------|
| Under 20 | 20-29 | 30-39 | 40-49 | 50-59 | 60+ | Not given |
| 78 | 634 | 1303 | 1231 | 1056 | 1041 | 808 |

### Who is behind free trial offer frauds and where are they located?

The FTC's enforcement in this area strongly suggests that many of the free trial offer/subscription traps enterprises operate from the U.S. and Canada. FTC cases have all been against U.S. enterprises except Jesse Wilms, who ran his operation from Western Canada. Nevertheless, these may well use merchant processing accounts from overseas banks. The CAFC's study in April 2017 found 312 merchant accounts from banks in 14 countries. The most common location for banks behind the credit card processing were China, Latvia, Canada and the UK. These companies also sell extensively outside the U.S.; in one recent FTC case the defendants claim that 93 percent of their customers are in other countries.

# Better Business Bureau ®

## How Free Trial Offer Frauds Work

An FTC case from 2010 may help illustrate how these free trial offer enterprises actually operate. The following contains the FTC's evidence and allegations made in court before the case ultimately settled:

**Central Coast Nutraceuticals** *(CCN)* sold a weight loss pill called AcaiPure, as well as a "colon cleansing" product dubbed Colopure. At the time, Acai berries were all the rage and were supposedly a miracle diet product. Acai berries grow on Acai palm trees in South America. CCN said its AcaiPure weight loss pills contained an extract of Acai berries.

CCN hired "affiliates" that placed ads at popular internet sites. Those who clicked on these links were first taken to "landing pages" that looked like independent news articles written by "reporters" who had supposedly investigated CCN's diet products and, to their surprise, found they produced amazing results. Readers were then provided with a link to click through to CCN's website. The affiliates were paid a commission from CCN when they got people to go to the website, or when they signed up for a free trial. The FTC separately **sued an affiliate network** that was using this tactic to get people to CCN's website.

CCN's website was well designed and very professional. It even had a "virtual spokesperson" in a video superimposed over the text who talked about the "benefits" of the products. In addition, CCN's site claimed that the products were endorsed by Rachel Ray and Oprah Winfrey.

The spokesperson claimed that the pills were "scientifically proven to help people lose up to five times their body fat, compared to a traditional diet and exercise program," and that they enable "rapid weight loss in a fiercely short time period, without any unwanted side effects, starvation, impossible to follow diet schemes or unnecessary fatigue." For its Colopure colon cleansing product, CCN listed dramatic information about the dangers of colon cancer and conveyed that its product would prevent colon cancer.

In addition, CCN claimed that people could get a free trial of these products for only a few dollars and see for themselves if they worked.

*Click here to download and view this short video of the speaking model and the website.*

**As CCN's video model said:**
"We stand behind  Pure, and by doing so, we're not even going to ask you to pay for it. That's right. We'll send you a risk-free 30-day supply of our incredible AcaiPure, absolutely free of charge, so you can experience the amazing and incredible, fat-fighting power of AcaiPure first-hand without any risk. All we ask for is for you to pay a small shipping and handling fee of $4.95 and we'll rush it to you right away. So, be quick. With all the media attention surrounding AcaiPure, supplies are going fast and we can't guarantee this free 30-day supply will still be available next time you visit us."

| Consumer uses search engine or other high-volume site to find "Acai" |   |
| Search reveals an acai berry warning link placed and paid for by affiliate |   |
| Warning link takes consumer to a news site owned by the affiliate advertising their product |    |
| Convinced by the investigative report the consumer clicks the merchants link and purchases products. Merchant then pays the affiliate for each purchase through the link |  |

Customers were asked to provide their credit or debit card numbers to pay $4.95, or sometimes $1.95, for the "free" trial. Those who did were shipped a one month supply of the pills and were often charged $59.95 right away. And CCN would continue sending – and charging for – these pills every month.

These terms were only disclosed in very fine print if a customer scrolled down to the bottom of the order page where customers entered their credit card number. Another fine print statement said that by ordering, customers agreed to CCN's terms and conditions. You can see the fine print by going to the end of the video.

So how did the free trial actually work? Victims had to

# Better Business Bureau®





**Julia** investigates the Acai Berry diet to find out for herself if this super diet works.

Acai berries are the latest weight loss fad. These so called Super Foods that you take as a supplement to lose weight have been getting a lot of international attention. And like you have probably already seen; they are all over the internet in blogs and success stories of people who have apparently used the pills and lost a ton of weight. But we here at News 6 are a little skeptical and aren't sure that we are any real proof that these pills work for weight loss. So we decided to put these products to the test. What better way to find out the truth than to conduct our own study?

To get started, I volunteered to be the guinea pig. I applied for a bottle of the LeanSpa Acai. While there are ton's of Acai berry ads online, LeanSpa Acai is one of the most credible and trustworthy suppliers on the market. It included the Free trial of the product and it did not try to fool me into agreeing to additional hidden offers. Another reason why I chose LeanSpa Acai is because it is the most concentrated and purest acai products on the market. This would give me the most accurate results for my test.



receive the pills and return them within 14 days to avoid being charged. Of course it took several days for the product to arrive, so it was really not possible for people to try the pills and see if they worked before they had to be sent back.

The invoice victims received explained that in order to return the product they had to call and get a Return Merchandise Authorization Number *(RMA)* from CCN. But often, CCN didn't answer its phone number, so those were difficult to obtain.

In addition, victims not only had to pay to ship the product back, they also had to do so in a form that provided proof that CCN actually received them, such as certified mail. Again, victims did not learn of this condition until after they had received the pills.

Many victims struggled to get a refund. And all the while CCN kept shipping more bottles of pills and charging customers credit cards.

But what about the pills? The FTC alleged the Acaipure and Colopure pills were nearly the same pill, though Colopure did not contain the acai berry extract. According to a medical expert assisting the FTC, there was no reason to think either product worked as claimed. He said AcaiPure simply had a laxative effect and none of the ingredients could produce the weight loss effects CCN claimed. He also said that, contrary to CCN's claims, there had been no scientific studies conducted on either acai berries or AcaiPure.

**The FTC noted that BBB received over 2800 complaints about CCN.** The National Advertising Division of BBB found CCN's claims about colon cleansing deceptive, and although CCN promised to end those claims, it instead changed the product name and continued to make the claims. Despite being sued by **Oprah Winfrey** for claiming she endorsed the product, CCN continued using testimonials for her. CCN settled another case over its free

trial offer practices with the Arizona Attorney General's office but continued operating in violation of that court order.

**Victims lost at least $80 million to CCN.** The FTC sued the company in August 2010, and a federal court in Chicago froze its assets and appointed a receiver to take over operations. One and a half million dollars was recovered to refund to victims.

## Anatomy of the Fraud

*Several components must come together for the fraud to be effective. These usually include:*

**1. A product**
**2. Enticing advertising**
**3. A website**
**4. Celebrity endorsement**
**5. Product shipping**
**6. Payment processing**
**7. Customer service operations**

While these functions could be done from one office, a variety of players often work in tandem to make the deception effective.

### 1. The Product

To engage in a deceptive free trial offer there must be a product to sell. Over the last ten years these have mostly consisted of diet pills, teeth whiteners, wrinkle and anti-aging creams and, most recently, cannabis extract products.

Despite the fact that the pills are often sold for around $100 for a 30 day supply, the pills themselves are not necessarily costly. An online search for Acai berry pills found at least **one web site** offering pills in bulk at a cost of

# Better Business Bureau ®

## Inside a Free Trial Scam



| Consumer decides they would like to try the "FREE TRIAL". |



They expect to pay $1.03 plus shipping.

When in actuality they are paying $94.31 for a trial pack and an auto monthly renewal subscription to Product A.



Consumer begins to complete checkout.

An additional $94.31 for a trial pack and monthly subscription to Product B is added to the total without the consumer's knowledge.



The total cost is $188.26 for the consumer trial packs and monthly subscriptions to Products A and B.

Much higher than the expected $1.03 plus shipping.

---

100 pills for three cents.

The claims made for the products sold through fraudulent free trials are often deceptive. **The FTC has issued a guide** for advertisers about weight loss claims that are basically never true, such as that a product "causes substantial weight loss no matter how or how much the consumer eats." Similarly, the FDA **has warned** that claims made for anti-aging creams or wrinkle removal are also unlikely to be true.

Some recent free trial offers include pills made from Cannabis extract with an ingredient called CBD. The FDA has again warned about claims made about CBD - particularly those that claim they can prevent or cure diseases.

The **FDA** in the U.S. and **Health Canada** both require that labels for dietary supplements list the ingredients they contain. Despite these requirements, how do you know that the products contain what they claim? **One FTC case** involved spam email selling male enhancement pills that were said to be "100% herbal and safe." In fact, the pills contained sildenafil (the active ingredient in Viagra) which can pose a health risk and requires a prescription. The company also claimed to sell generic versions of prescription drugs that were FDA approved. However, the pills, shipped from India, were not approved by the FDA and were sent without a required prescription. A recent article in **Scientific American** found that hundreds of dietary supplements actually contain prescription drugs.

**Advertising**. In order to get victims to decide to try a "free trial," these frauds often make extreme claims for the supposed merits of their products. In addition to claims that are "miracle" products, medical breakthroughs or that new science proves that they work, deceptive claims are often conveyed in "testimonials" from supposedly happy customers or, as discussed below, endorsements by celebrities or other trusted figures.

**Substantiation.** Central to all consumer protection laws on advertising is the principle that claims for products must be truthful and substantiated. For some claims, absolute truth may be difficult to establish, and in those cases advertisers must be able to back up their claims with "substantiation." These are basic principles of advertising law supported by the FTC, the state attorneys general and BBB. Here is the **FTC policy statement on substantiation**. Under Canadian law, as well, companies must have adequate and proper testing to support their product claims. Some FTC free trial offer cases have challenged product claims while others have focused solely on the deceptive free trial marketing.

So what sort of substantiation, or support, must advertisers have before they make claims for their products? Testimonials from "happy" customers or popular articles will not suffice. Most claims about diet pills, wrinkle creams or other products sold as "free trials" are going to require some sort of clinical study or other scientific evidence. Needless to say, many of the "miracle" claims made for products sold through free trial offers lack any such support, and defendants in the FTC cases have made few attempts to justify the claims they make.

# Better Business Bureau®



**\*EDITOR'S NOTE:** Ryan Haughman has worked with the official suppliers of Nutri Fast Garcinia to temporarily provide 1 month samples for our readers!

**\*\*Update: LIMITED FREE SAMPLES AVAILABLE** - As of Wednesday, April 05, 2017 , Thise Still FREE Samples!



Step 1
**FREE 30 DAY SUPPLY OF**
**NUTRI FAST GARCINIA**

GET A FREE SAMPLE
(http://xo1iv.voluumtrk.com/click/1)

Free Sample Promotion Ends On
**Wednesday, April 05, 2017 At Midnight!**

## 2. Deceptive Affiliate Marketing

Many fraudsters offering fake free trials drive traffic to their websites by using display ads and sponsored content. In addition, **BBB** found that nearly 30 percent of victims encountered these ads on social media.

For example, the "one tip for a tiny belly" ad has been used to promote free trial offers. As described in a **Washington Post article**, the FTC found that it led users to a health-related fake free trial.

Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a "landing page" that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading "free trial" offers can be **$30 to $50** for every person who signs up.

Often, deceitful advertisements for these offers use landing pages that are designed to look like consumer articles from reputable news sites. In one other, the articles promoted Acai berry diet pills. The fake articles appeared to be from news websites, and were hosted

on domains with names like "**channel5healthnews.com**; **dailyconsumeralerts.com**, and **online6health.com**." these websites often include falsified celebrity endorsements and fantastic claims about products. Some had the term "advertorial" at the top of the page, but the FTC alleged that this term did not reduce the deception. In addition, the comments supposedly posted by satisfied users at the bottom of the page were phony.

These articles included links to the domains where users could order "free trials" of the products.

In 2011, the **FTC sued ten different affiliates** who directed traffic to fake articles with deceptive ads.

**Emails.** Claims for bogus free trials may also come by email. Many people have received emails that appeared to be from an acquaintance, and contain only a link in the email body. These are sent by fraudsters, some of whom also work as deceitful affiliates. The links in the emails often take users to sites selling products with free trial offers. This is not a legitimate marketing technique; sending unsolicited email is a crime.

## 3. The web page

After clicking through from ads or landing pages by affiliates, victims arrive at the web page where they can get the free trial of the product. As noted in the following section, these may have pictures of celebrities that supposedly endorse the products. In some cases, they claim that a celebrity has left their job to launch a new skin care business, or that celebrities have invested their own money in the business.

The web pages appear professional. They often try to create a sense of urgency by claiming limited supplies are available. Sometimes, they also have "countdown clocks" indicating that the offer will expire shortly if the consumer does not act immediately.

Customers are required to enter their address and payment information. If any disclosures letting people know that they have only a short period of time to try the product and return it or be charged, or that additional



# Better Business Bureau®



supplies will be shipped monthly at a recurring cost, are on the landing page, they are often in very fine print and victims may have to scroll down to the bottom of the screen to encounter them.

These sites sometimes tell people that by entering their information they are agreeing to the terms and conditions which can only be seen if you click on a hyperlink and read pages of legalese. In some cases, people may be asked to check a box that they have read the terms and conditions. Most likely, people don't actually read the terms and conditions. As an April Fool's stunt, **one online game site** inserted a clause saying that by placing an order visitors were signing over their immortal soul. Very few people even noticed it.

It is illegal to offer a satisfaction guarantee, money back guarantee or free trial offer unless purchasers can get a full refund. Terms must be clearly disclosed. The FTC has **advertising guides**, compilations of rules developed through decades of law enforcement, that directly address free trial offers. The same provisions are contained in **BBB's Code of Advertising**. They state that claims of a satisfaction guarantee, money back guarantee or free trial

offer mean to the public that they can get a full refund, for any reason, if they are unhappy with the purchase. Many free trial offer scams refuse to give refunds.

These guides also state that an ad mentioning a satisfaction guarantee or similar offer should inform consumers of any material conditions or limitations on the offer. For example, a restriction on the offer to a specific time period, such as 30 days, is a material condition that should be clearly disclosed. Failing to disclose terms adequately is deceptive and therefore, illegal.

It is also illegal to trap people into continued monthly billing without full disclosure in advance and a simple way to cancel. The U.S. has a specific statute addressing this situation. Adopted at the end of 2010, the **Restore Online Shoppers Confidence Act** (ROSCA) followed **FTC hearings on negative option issues** on the internet. It helps consumers avoid subscription traps. ROSCA addresses recurring billing, and not just for free trial offers.



# Better Business Bureau®

It also covers repeated billings for things such as health clubs, dating sites, book/magazine clubs, cooking or other products sold on television.

## There are three main ROSCA requirements.

**1.** Such offers must "clearly and conspicuously" disclose all material terms of the offer BEFORE getting a consumer's billing information. So what does clearly and conspicuous mean? It basically means something that people can easily see and understand. The FTC has provided **some guidance** on how to do this. Important information can't be hidden in a hyperlink to terms and conditions, in fine print, or in a footnote.

**2.** Companies must get a "consumer's express informed consent" before charging people. In other words, consumers must affirmatively agree to the program of regular charges and understand them.

**3.** There must be a "simple mechanism" for a consumer to "stop recurring charges." California has its own **law on auto renewals** which has similar requirements.

Canada does not have a law as specific as ROSCA, though general principles of consumer protection law should reach the same result. It is illegal to create the false or misleading general impression that consumers can try a product for free, only paying for the shipping costs, when in reality they will be charged the full price of the product if they don't call and cancel within a certain number of days. The truth about how these offers work is often buried in the difficult to read and understand terms and conditions, or fine print. The same terms and conditions will often state that the consumer has been signed up for a monthly subscription to the product.

The Competition Bureau, the Canadian agency that addresses false and misleading conduct in the marketplace, says that deceptive and misleading conduct in the digital marketplace is a priority and that they are actively examining claims made to the public that might raise issues under Canadian law.

## 4. Celebrity endorsements

One of the oldest tactics in advertising is to claim that a celebrity uses the product. Celebrities are often paid for endorsing legitimate products.

Another basic rule of advertising law is that the endorsement must be real. In the case of the free trial offers, often the fraudsters simply obtain pictures of celebrities and claim that they tried the product and endorse it. Several of the FTC's free trial offer cases have directly challenged the claims that celebrities have endorsed the products when they actually have not.

In some cases, the deceptive websites even have fine print admitting that the claimed endorsement is not real. For example, a website claiming that Joy Behar was leaving "The View" to set up her own line of skin-care products actually contained this **fine print disclaimer,** posted inconspicuously:

> **"This website is not a source of facts or real information. All the content featured on our website is artificial and falls under the umbrella of fiction. … Any celebrities shown or mentioned on this page do not endorse this product."** *(emphasis added)*

**One such website** is still live, claiming all five **Shark Tank** judges invested in a product, and that its product is used by celebrities. Fine print at the bottom states that it is all a fake. An internet search of one picture used shows the same picture being used for dozens of other products. **Similar claims** about people leaving to form their own skin care companies have used the names of **Joanna Gaines; Marc Zuckerberg's wife Priscilla Chan, Sean Hannity's wife Jill Rhodes**, and **Lara Spencer from Good Morning America**. Similar issues involve **celebrities in Canada**.

The Australian Consumer and Competition Commission issued a **warning** about the use of celebrities being used to endorse fake free trial offer products on September 24, 2018. They state that these fake offers have used the names

# Better Business Bureau®

of: **Cate Blanchett; Deborah Knight** *(Nine News Sydney presenter);* **Delta Goodrem; Dr David Sinclair** *(Head of Ageing Lab UNSW);* **Dr Oz; Emma Thompson; Georgie Gardner** *(Today Show);* **Jessica Rowe** *(Studio 10);* **Kyle Sandilands; Lisa Wilkinson** *(Ch 10);* **Mark Shuttleworth** *(BBC/CNN);* **Meghan Markle; Mikhail Varshavski** *(Dr Mike – US Celebrity);* **Nicole Kidman; Oprah; Sally Field** (American actress); **Sonia Kruger** *(The Voice, Today Extra);* and **Steve Baxter** *(Shark Tank).*

In addition, Clearwater, Florida BBB has received complaints about free trial offers that claim endorsements by: **Tim Allen; Christie Brinkley; Priscilla Chan; Chelsea Clinton; Ayesha Curry; Leonardo DiCaprio; Ellen DeGeneres; Christina El Moussa; Sally Field; Joanna Gaines; Kathy Lee Gifford; Lori Greiner; Dr. Steve Gundry; Mariska Hargitay; Laura Ingraham; Angelina Jolie; Mila Kunis; Ashton Kutcher; Matthew McConaughey; Marie Osmond; Victoria Osteen; Dr. Oz; Sarah Palin; Shark Tank; Pauley Perrette; Robertson family of Duck Dynasty; Kelly Ripa; Gwen Stefani; Martha Stewart; Chrissy Teigen; Ivanka Trump; Melania Trump; Vanna White; Oprah Winfrey; Giada De Laurentis; Good Morning America; and Facebook.**

Toronto Star, Canada's largest daily newspaper, recently published an **article** describing fake celebrity endorsements and subscription traps.





## 5. Product shipping

The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns.

One would think it would be easy to identify these companies. After all, postage has to be paid and most mail has a return address. And most products we receive contain an invoice from the seller. Because the web pages where victims place orders typically don't include physical addresses, the only address victims may have is the address of the fulfillment company. But those addresses may end up being post office boxes or mail boxes etc. and not the actual location of the warehouse.

For example, BBB in Clearwater, Florida identified a **fulfilment company** they have tied to 447 different products sold through deceptive free trials. They have received 2900 complaints about these products from 2017 to July 2018. **BBB** for Central Ontario has similarly **warned of fulfillment centers** in the Toronto area.

## 6. Payment Processing

**Credit and Debit cards.** For bogus free trial offers, the payment methods of choice are credit cards and debit cards. Victims that have paid by credit card should file a complaint at **bbb.org** and contact their card issuer using the phone number on the back of the card, and contest the charge, a process called a chargeback.

# Better Business Bureau®



Unfortunately, credit card companies have often been reluctant to provide refunds to victims of free trial offers or subscription traps. The FTC cases regularly found that large numbers of people have been unable to chargeback successfully, and the same holds true for those who have complained to BBB. More than 1000 victims who had previously complained about deceptive free trial offers to BBB responded to a recent survey. Only 57 percent filed for a chargeback with their credit card company. Of those who did request a refund, 44 percent did not receive one and 14 percent got a partial refund. It may be necessary for credit card issuers to review their chargeback policies as they relate to questionable advertising tactics.

A **story on free trial offer scams** by the Canadian Broadcasting Company (CBC) in 2017 found that credit card companies were not authorizing chargebacks even when the reality of these situations was disclosed only in the terms and conditions. As noted above, legally these types of key terms must be disclosed clearly and where people can actually see and understand them.

In addition, the scams employ a variety of methods to try to evade credit card companies' anti-fraud policies.

The credit card companies and payment networks do not want to support fraudulent activity, and they regularly terminate merchant accounts of fraudulent operations when they detect them. In 2016 the Canadian Antifraud Centre (CAFC) began getting complaints from people who had large charges on their credit cards bills after visiting Costco's website. What they learned was that victims at the site were seeing pop-ups asking them to do a short survey. Because the survey mentioned Costco, victims believed that this was by, or authorized by, Costco, and when they saw a free trial offer for wrinkle creams they often used their credit card for a small "shipping and handling" charge. These victims then learned that they had fallen for a subscription trap.

The CAFC was able to identify 400 or so merchant accounts being used in this ploy and reached out to MasterCard and Visa. Because these sites were not affiliated with Costco, the merchant accounts were shut down.

So how does a credit card company know if a company accepting credit card transactions is a scam? As a first step, the company can review the application for a merchant account and inspect a company's website before letting them join the system. Additionally, credit card companies track chargeback requests; if chargebacks constitute over 1 percent of transactions from a given merchant, that raises red flags, more investigation or fines, and possibly termination.

Visa has rules that apply to merchants who accept their cards as payment. Merchants that accept Visa cards must ensure that customers have a fair chance to review all terms and conditions they are agreeing to before completing any transactions. These rules apply worldwide.

Specifically, merchants must properly disclose any refund or exchange policies to the cardholder at the time of the transaction. This also would include any terms about ongoing transactions if the cardholder fails to cancel within the given time frame. For example, for internet transactions, merchants must properly disclose terms on how to avoid charges for free trials or subscriptions for continuing shipments on their web pages before final checkout and include a "click to accept" button, checkbox or other acknowledgement. When these terms are not disclosed, Visa recommends that victims contact the bank that issued

**Credit Card Refund Requests and Results After Free Trial Fraud**



- 🟦 Didn't ask for refund
- 🟦 Didn't receive requested refund
- 🟨 Received partial refund
- 🟥 Received full refund



# Better Business Bureau®



their credit card and ask for a chargeback to get their money back. Visa says that the burden of proof is on the merchant.

BBB efforts to reach MasterCard were unsuccessful. However, a story of these types of free trial offers by the Canadian Broadcasting Company in 2017 states: "MasterCard's customer service told a marketplace producer that consumers are responsible for finding any charges that may be listed in the terms and conditions, even if they're in "difficult places to see." American Express declined to comment on its practices, and Discover recommends that consumers dispute charges involving deceptive transactions.

Here are some ways fraudsters avoid detection by credit card companies.

**Using a crooked processor.** Banks that offer credit card processing hire Independent Sales Organizations *(ISO's)* to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity.

But what if those providing processing services are in on the fraud? The FTC has **sued a number of these ISOs** over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity.

**Getting many merchant accounts through shell**

**companies.** Even without the aid of a dodgy intermediary, fraudsters can find ways to evade detection. A defendant in **another FTC case** employed 51 shell corporations to get merchant accounts and avoid detection and lied to banks on his merchant account application.

**Having "clean" websites.** It is illegal to bury key terms in fine print or other places where victims are unlikely to see them. In **another FTC case** the company had different versions of its websites. If consumers simply typed in the URL of its websites, a version appeared with prominent disclosures. But consumers that arrived at the website after clicking through from an affiliate site saw something very different and would not have seen the disclosures. This can also make it difficult for victims to show that they have been deceived if they later go to the websites after finding unexpected charges on their cards.

**Laundering.** What if the credit card charges pass through the account of a merchant that has lots of legitimate business? Doing this can keep overall chargeback rates down. This tactic is illegal under the FTC's Telemarketing Sales Rule.

**Changing product names and website addresses.** Some companies may offer the same product under a variety of different names and change the web pages continuously. Fake news or other landing pages may only appear at a particular web address for a couple of days. This makes it harder for victims, law enforcement and credit card companies to find out what is really happening.

**Using offshore banks to process.** In some cases, the fraudsters get merchant accounts through offshore banks. Those banks may permit more risky behavior in exchange for charging more for the processing.

So what is a consumer to do? Most of us don't keep screen shots of the web sites we visit. But if someone can find the site and take a screenshot, it may help with a chargeback request. And requesting a chargeback is important -- not only for getting money returned, but also by helping credit card companies identify fraudulent operators.

Debit cards may offer more protection against continuing shipments when money is drawn directly from a bank account. **Regulation E** implements the Electronic Fund Transfer Act in the U.S. and provides special protections. Under Section 10(e):

- First, no recurring debits can be made unless the consumer has provided a written authorization signed OR has similarly authenticated their agreement to be charged repeatedly. Electronic signatures are permitted, but those are also subject to other rules; just clicking a box will not be sufficient.
- Second, no authorization is valid unless the terms are "clear and readily understandable" AND they "should evidence the consumer's identity and assent to the authorization."
- Third, a copy of the authorization must be provided to the consumer. Victims should complain to their banks if they see such charges on their bank statements.

The FTC has charged violations of Regulation E in several of its cases.



# Better Business Bureau®

## 7. Customer Service

Most free trial offer companies have telephone numbers to call, although many victims report to BBB that they have difficulty in getting a live person on the phone, and that many of those answering the calls can be quite rude. For the most part victims report that they are often able to stop future shipments and charges, but usually cannot get refunds for charges already made. At best victims are offered partial refunds.

Free trial offer frauds have an incentive to respond to complaints and discourage victims from going to their credit card company and seeking a chargeback, because more complaints to the credit card company can result in the loss of the merchant accounts needed to process credit cards.

## Victim Narratives

*Rose, a nurse from St. Louis,* reported seeing a social media ad on her phone for a skin cream product. It was sold by a company called Purely Organic Cosmetics, and the ad claimed that the product was endorsed by Shark Tank. Because it was just a few dollars to try the cream, and she said she believed Shark Tank was helping to market the product, she decided to give it a try.

Rose said she used a preloaded Visa card with $75 to pay $4.96 for shipping and handling on a free trial offer of the product. While online, she saw an offer for a second product for $2 shipping and handling, and also paid to try that product. She did not see an end date for the trial period, or that the company would continue to ship products. She thinks she may have clicked a box saying she agreed to terms and conditions, but is not sure.

When she told her family about the free trial product she received, they warned her that it could be a scam. Rose did an internet search for Purely Organic Cosmetics and found lots of complaints. She said she checked her credit card balance and found only $1.75 remaining.

After calling the company and waiting on hold for over an hour, she was told she could not get a refund, and that a third shipment of products was on the way. She said she was able to stop more shipments but could not get a refund for what she already paid.

When Rose called her credit card company to dispute the charges, she was told that the charges were in the terms and conditions, and that because she had accepted them, she could not get her money back. Her husband printed the terms and conditions, and did find information about continuing shipments.

Rose says she did try the lotion for a day or two, but didn't notice anything special and she threw the products away.

## Miracle Anti Aging Facial Rejuvenation Cream Nets Biggest Deal In Shark Tank History – See Why Sharks Jumped On This Wrinkle Remover

Posted By: **Rose Wanderer** On **December 10,2016**

   



*Kim, from Marin County, California,* said when she saw an online ad for a free trial of a diet product called Extreme Fit 180, she was impressed because the ad claimed the product was endorsed by the entire cast of Shark Tank and they had all invested in it.

She said the cost was only $4.95 for shipping and handling, so it seemed worth a try. Before she could check out, she had to view a pop up page for an "Extreme Cleanse," which she was not interested in, and another for a green tea diet supplement. She thought that at the end she could view her cart and remove these if there was a charge because she did not want them. She says she did nothing to indicate that she wanted the other items.

After Kim submitted her order she said got an email alert that her credit card had been charged for the two items she did not want so she immediately called to cancel, and was told the items had already shipped and to just keep them.

Two weeks later, after Kim found a charge of $79 on her credit card from the diet product company, she called the company and left messages, but no one returned her call. The third time she reached a

# Better Business Bureau®

## MAGNOLIA

WACO, TEXAS | FRIDAY EVENING | APRIL 21, 2017

# DON'T BELIEVE EVERYTHING YOU READ

"People say believe half of what you see, son
and none of what you hear
But I can't help but be confused
If it's true, please tell me dear"
– Marvin Gaye

woman who was quite rude, telling her "Well, did you read the fine print? Your 14 day free trial is up and now you owe this." Kim explained that she had called immediately to cancel, and the operator told her notes showed that she had only cancelled the orders for the Extreme Cleanse and the Green Tea product. Kim said no, she had canceled everything and was going to complain to BBB. The operator said she would cancel her account, but would not refund her money.

After a quick internet search, she found complaints from other people that had the same experience. She called BBB and her bank to complain; the charges later were removed.

A box with the three products arrived, and she said she threw them away.

*Stacy, from Chicago*, reported that she saw an internet offer for a new skin care product, Luster Skin, from Joanna Gaines. It was a free trial, and customers only had to pay shipping and handling. She entered her address and credit card information but didn't think the order went through, so she went back to the site and in minutes the product had a different name. Stacy entered her information again and saw the same product being endorsed by Kate Middleton and Sally Field. She captured screenshots of some of the web pages that featured Sally Field.

She said she received two different products, a serum and an eye cream. She tried the products and concluded that they didn't work. Her credit card statements had small initial charges for the shipping and handling, and then two $95 charges for the

products appeared two weeks later. One charge was from San Diego and the other was from Texas. She said she called the phone number on the invoice to cancel and was told that she only had 14 days to cancel, and she was calling on day 15. Stacy said she never saw disclosures that she had 14 days to cancel. After two more calls to the company, they refunded half of her money.

Stacy said that she would like to tell this company that they are lying crooks and to stop ripping people off.

*Julie works in HR in Omaha.* In 2017, she reported that she saw an article on Facebook about a UCLA student who discovered an excellent way to lose weight by using a product called Garcinia Cambogia. She thought it would be worthwhile to get a free sample by paying $4.95 for shipping, so she entered her credit card number. She saw no terms or conditions.

She tried the pills for a few days and said she didn't notice any results. She then received a second bottle of pills in the mail and thought it was a mistake, so she emailed the company and was told to call customer service. After spending 40 minutes explaining that she did not want more pills and wanted her money back, the operator told her that "you accepted the terms, and there is nothing we can do." They told her that the company could end her "membership" and stop shipping more, but she could not get her money back. She lost $184.

Julie went back to the web page where she had placed her order, and saw that the conditions of the trial and continuing shipments were mentioned in fine print on a gray background. She says she would never have provided her credit card information for the trial if she had seen the terms before purchasing.

She talked to a representative from her bank, who said there wasn't really anything she could do. She complained to BBB. She also found and joined a Facebook group with almost 1500 members called "STOP GARCINIA CAMBOGIA FREE TRIAL SCAM." She says that many of the experiences discussed in the group are very similar to hers.

Julie told BBB she wonders how the people at this company can sleep at night, and would like to tell them to quit stealing from people.

*Renee teaches fifth grade in Texas.* She stated that in December 2017, she saw an ad on Facebook stating that Joanna Gaines was promoting a new skin care line. She said she thought it was worth $5.95 to get a sample of an anti-aging skin cream product to see if she liked it. She looked to see if she was signing up for something unexpected and didn't see anything, so she entered her debit card to get the trial item.

# Better Business Bureau®

*The next day she saw charges on her bank statement for $109 and $103. She talked to her bank, which helped her call the company. Renee told the company that she had not authorized these charges and did not want the products. She was told that she would have to pay a $40 restocking fee to return the products, and would then get a refund in 7-10 days. Renee also went to the website of the company and saw that there were prominent disclosures about when the product had to be returned to avoid charges and that more would be shipped to her monthly. Renee said she felt certain that these disclosures were not on the ad she saw when she ordered.*

*She also reported that she found a blog by Johanna Gaines warning the public that she had not developed cosmetic products.*

*When Renee received the products, she shipped them back to the company by certified mail. She did not try the product because she said she felt the company was a scam. Despite calling the company several times, she has never received a refund. Her bank ensured that her card could not be charged again. She complained to BBB, but the company still did not give her money back.*

## Efforts to combat the fraud

### BBB's Role

Before doing business with any company it is a good idea to check them out with BBB. There are more than 100 BBBs across the U.S. and Canada, some also with regional offices, and all keep track of and list information online about businesses, not just ones that are "members" (known as Accredited Businesses). Visit **BBB.org** and enter the name of a company to learn more. Make sure to search nationwide, not just in your locality.

To be accredited, businesses must agree to comply with BBB Standards for Trust. Accredited businesses can use the BBB seal on their websites or in their advertising. But beware, there are companies out there that will use the BBB seal without permission. If any doubt exists, check the business out on the BBB.org website. Businesses that do not comply with BBB's standards are ejected from BBB. Accredited businesses must also agree to resolve complaints.

BBB also collects and tries to resolve complaints about businesses that are not accredited. BBB has seen thousands of complaints about misleading free trial offers.

The FTC regularly reaches out to BBB for copies of complaints or other data on companies it investigates. In its cases the FTC often says that dishonest companies only give refunds if consumers report them to BBB or a law enforcement agency.

In addition, BBB assigns businesses a letter grade, from A+ to F, based on complaint activity, regulatory actions and other factors reflecting the BBB's opinion of how the business is likely to interact with its customers. Consumers are encouraged to check out a company's rating before

doing business and to report fraud.

BBBs have been able to tie many products and companies to fulfillment operations that ship products for different companies. In fact, one fulfillment company has shipped over 400 of these products for many of the businesses in this category.

In addition, each of the local BBBs has a person assigned to advertising review, and consumers can submit questionable ads for free trials or other issues to **BBB Ad Truth** for review.

**BBB** has issued warnings about free trial offers in **Ontario**; **Northeast Florida**; **North Carolina**, **North Alabama**; **Central Georgia**; **Montana**; **New York**; and **Delaware**. Many other **BBB** offices have worked with the media to warn about this type of fraud.

## Law Enforcement

Over the last ten years, the Federal Trade Commission has been very active in challenging bogus free trial offers. Many of these, but not all, have also included continuing monthly shipments and charges for products. The FTC has consistently **warned** consumers about this type of fraud. They even **produced a video** on this subject.

Products involved have included diet pills, tooth whiteners, offers of supposedly free government grants, colon cleansers and wrinkle creams. Most have involved advertising and sales exclusively over the internet, but one, Berkeley, also advertised extensively on television.

BBB has identified 16 cases of this type that the FTC has brought over the last ten years. In many of these cases, courts have entered injunctions, freezing assets of the companies and their owners and effectively putting them out of business.

Many of these cases have been settled; others won in court. One, Triangle, is still litigating and has been appealed.

Losses to victims can be calculated, even in a settlement, because the FTC usually gets a judgment for the full amount of losses, subtracting refunds from the company or refunds obtained from credit card companies, but suspends that judgment if defendants provide available remaining assets for the FTC to return to victims. Much of the money made by such operations is spent along the way so there is rarely enough money to provide full refunds to victims.

Total losses in 15 cases resolved to date total $1.3 billion. If average losses were $100 (and they could be higher), that would mean there could be 13 million victims involved in these cases. See a list and descriptions of the these cases at **bbb.org/stlouis/ftc-free-trial-offer-cases**

**State cases.** Several state attorneys general have filed civil actions jointly with the FTC. In addition, another case against free trial offers was filed by the Santa Monica, California District Attorney's office. **Beachbody** was a settlement announced in 2017. The company sold exercise videos, supplements and weight loss products. The order required a separate check box for auto renewals, and the company paid a $3.6 million fine.

**Criminal cases.** After the FTC has taken civil action, it may refer cases for criminal prosecution. **BBB** is aware of two cases so far where that has occurred. Steve Warshak,

# Better Business Bureau®

owner of Berkely, was **convicted and sentenced** to ten years in prison. Jeremy Johnson, the owner of Iworks, was **sentenced to 11 years in prison** after appeal.

In addition, a recent **indictment** in federal court in Tennessee charged several businesses and individuals over a massive healthcare fraud. The criminal charges also contended that the same enterprise was advertising "free trial offers" for "millions of dollars" worth of products such as weight loss pills, skin creams, and testosterone supplements.

**What should you do if you believe you have been a victim of a free trial offer fraud? You have options:**
- Complain to the company directly.
- If that is not successful call the customer service number on the back of your credit card to complain to the bank.
- Complain to **www.bbb.org**
- Report the fraud to **www.bbb.org/scamtracker**
- Report it to the **Federal Trade Commission (FTC)** or call **877-FTC-Help**
- Report it to the **Internet Crime Complaint Center**, or IC3
- Report it to the **Canadian Anti-Fraud Centre**. Toll free from the US at **1-888-495-8501.**
- In Canada you can also complain directly to the **Competition Bureau**.
- Report suspicious, confusing or misleading ads to **BBB Ad Truth.**

## UPSELLS

When buying things over the phone or internet, consumers also are often offered additional products or services - a practice known as an "upsell." For example, someone may see an item advertised on television and call to place an order. After providing their credit or debit card number the company may offer to send an additional product, perhaps by just saying: "and today we are also going to send you a second product to try" with no mention of the price. Because the company already has your credit card number, they may simply ship the product and charge you for it.

Or, the company you reached out to may simply transfer you to another company and it does the upsell. If the company you originally contacted shares your credit card number with a second company, they may be able to charge you even if you don't know the full price and didn't intend to agree.

Congress has responded to widespread complaints about such upsells, and the ROSCA law addresses it. For internet transactions, any upsell by third parties must first disclose clearly and conspicuously all material terms of the transaction, a description of the goods or service being offered, and what the cost is. They also must get the full credit or debit card number from the consumer, their name, address and a means of contacting them.

For telephone upsells, such as when you call to buy something advertised on TV, the rules are a bit different. If during the call, you are offered a "free trial" of an additional product, companies must get at least the last four digits of the debit or credit card, and obtain your express informed consent. They must record and keep an audio recording of the entire sales call, not just the part where you agree to the charge.

If the telephone call does not involve a free trial offer the requirements are not as strict.

## Recommendations

- BBB urges credit card companies to do more to ensure victims receive chargebacks where key conditions are not adequately disclosed. Because this fraud is dependent on the use of credit cards, more effort is needed to identify and combat deceptive free trial offers employing credit card systems. Also, it would be helpful if they could do more to educate their customers.
- Additional criminal prosecutions of this conduct are needed. The FTC and BBB have done much to address the issue, but do not have the ability to bring criminal charges. Only criminal prosecutions are likely to deter this type of fraud.
- Social media sites should do more to curtail such deceptive advertising.
- International cooperation is needed to combat this fraud. U.S. and Canadian law authorities need more information about victims from other countries. In addition, evidence and other key information may be located in a variety of countries around the world.
- More consumer education is needed from news media and consumer groups like BBB.

*By Steve Baker, BBB International Investigations Specialist*

*BBB appreciates assistance provided by FTC and BBB Clearwater.*

*BBB and the Torch Logo are registered trademarks of the Council of Better Business Bureaus, Inc . All other trademarks, product names, logos, and brands depicted herein are property of their respective owners and are used for identification purposes only and not to imply endorsement.*

# EXHIBIT 2

Kevin Kneupper, Esq. (CA SBN 325413) *pro hac vice application forthcoming*
kevin@kneuppercovey.com
Kneupper & Covey, PC
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
512-420-8407

*Attorney for Plaintiff Cindy Adam*
*and the putative Class*

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CINDY ADAM, | Case No.: |
| Plaintiff, | **DECLARATION OF KEVIN M. KNEUPPER RE: VENUE PURSUANT TO CAL. CIV. CODE § 1780(d)** |
| vs. | |
| SFLG INC.; and KURT ELLIS, | |
| Defendant(s) | |

I, Kevin M. Kneupper, do hereby declare as follows:

1.      I am a partner at Kneupper & Covey PC, counsel of record for Plaintiff Cindy Adam. I am licensed to practice law in the States of California and Texas. I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      This action was originally commenced in California and dismissed without prejudice against the defendants for lack of personal jurisdiction.

3.      Venue is proper in this Court under the California CLRA because Defendants have done business in the County of Monmouth County, New Jersey by executing contracts with key parties involved in this case.

I declare and state under penalty of perjury pursuant to the laws of the State of California and State of New Jersey that the foregoing is true and correct, and that this Declaration was executed this 18th day of September, 2020 in Glendale, California.

Kevin M. Kneupper, Esq.
Declarant

DECLARATION OF KEVIN M. KNEUPPER RE: VENUE TO CAL. CIV. CODE § 1780(d)